**COMMITTEE OF UNITED STATES CITIZENS LIVING IN NICARAGUA, et al., Appellants,**

v.

**Ronald Wilson REAGAN, President of the United States, et al.**

No. 87–5053.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1987.

Decided Oct. 14, 1988.

As Amended Dec. 16, 1988.

Jules Lobel, David Cole, Washington, D.C., Michael Ratner, Springfield, Mass., and Jim Klimaski were on the brief for appellants. Lynn I. Miller, Washington, D.C., also entered an appearance for appellants.

Mark B. Stern, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees. Robert E. Kopp, Alfred R. Mollin, and Douglas N. Letter, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellees.

Michael Maggio, Washington, D.C., entered an appearance for amicus curiae. Unitarian Universalist Association, et al.

Before ROBINSON and MIKVA, Circuit Judges and GORDON,* Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants, comprising organizations and individuals who oppose United States policy in Central America, claim to have suffered physical, economic and other injuries from the war in Nicaragua. These facts form the backdrop to this lawsuit.

The suit finds its genesis, however, in a 1986 decision by the International Court of Justice (ICJ), which held that America's support of military actions by the so-called "Contras" against the government of Nicaragua violated both customary international law and a treaty between the United States and Nicaragua. The ICJ concluded that the United States "is under a duty immediately to cease and to refrain from all such acts as may constitute breaches of the foregoing legal obligations." 1986 I.C.J. 14, 149. Included among those acts were the "training, arming, equiping, financing and supplying [of] the *contra* forces." *Id.* at 146.

Prior to the ICJ's decision, the United States withdrew from the merits phase of the court's proceedings, contending that the court lacked jurisdiction over Nicaragua's application. Since the decision, the President has requested and Congress has approved continued funding for the Contras of the sort that the ICJ found illegal. In addition, the U.S. used its veto power in the United Nations (U.N.) Security Council to block consideration of a resolution enforcing the ICJ decision.

Unhappy with their government's failure to abide by the ICJ decision and believing that continued funding of the Contras injures their own interests, appellants filed suit in the United States District Court for the District of Columbia. The suit sought injunctive and declaratory relief against the funding of the Contras on grounds that such funding violates the Administrative Procedure Act, the first and fifth amendments of the United States Constitution, Article 94 of the U.N. Charter, and customary international law.

In their presentation to this court, appellants make no argument on behalf of their first amendment claim, nor do the facts that they have pleaded suggest first amendment violations. Thus, the only constitutional claim we need consider is the alleged violation of fifth amendment rights. All of the remaining nonconstitutional claims rest upon one central contention: that the United States has contravened the ICJ judgment. Failure to adhere to that judgment allegedly violates three separate legal norms: customary international law, Article 94 of the U.N. Charter (which enjoins obedience to ICJ judgments), and the Administrative Procedure Act (which grants relief to persons "aggrieved" by agency actions that are "not in accordance with law").

The district court dismissed appellants' entire complaint on the ground that it involved nonjusticiable political questions. We believe the trial court's reliance on the political question doctrine was misplaced, particularly to the extent that appellants seek to vindicate personal rights rather than to conform America's foreign policy to international legal norms. Like the trial court, however, we find that the complaint warrants dismissal. Although we conclude that the complaint is justiciable, we believe that it fails to state a claim on which relief can be granted. Pursuant to Fed.R.Civ.P. 12(b)(6), we therefore dismiss the case.

## I. BACKGROUND

Several differently situated plaintiffs join forces in bringing this suit. Although they are united in the relief that they request, the interests they seek to vindicate are of three different sorts. To begin with, two of the plaintiff organizations seek to strengthen the influence of—and respect for—the United Nations. They claim that continued United States support for the Contras frustrates that objective by undermining respect for the ICJ, which functions

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

as the judicial arm of the United Nations. A second group of plaintiffs claims a different sort of organizational injury. This group comprises three organizations (one of which is now defunct) that send economic aid and volunteers to Nicaragua in order to improve the standard of living in that country. They allege that funding for the Contras hinders their work because the violent conflict dissuades potential volunteers from going to Nicaragua and because projects that plaintiffs have aided in Nicaragua (e.g., health clinics) have been attacked or destroyed by the Contras.

Plaintiffs in the remaining category allege that American support for the Contras threatens their safety and property, directly infringing their personal rights under international law and the fifth amendment. These plaintiffs include five named individuals living in Nicaragua. One of these has been killed—allegedly by the Contras— since this suit was filed; another claims to have been repeatedly "detained, threatened and deprived of her liberty" by Contra forces. Complaint at ¶ 4(d). Yet another allegedly has been "detained several times by the contras." *Id.* at ¶ 4(g). In addition to the individual plaintiffs, two organizations advance similar claims in their representative capacity. The Committee of United States Citizens Living in Nicaragua represents over 100 Americans living in that country and alleges that its members are placed in danger of physical harm by Contra military activities. Similarly, one of the organizations that supports social welfare projects in Nicaragua alleges that its volunteers are endangered by Contra attacks on those projects.

These claims of physical harm and the threat of harm from Contra activities rest in part on a generalized fear of the recurring violence in Nicaragua. But appellants also aver that Americans are among the Contras' specific targets. Contra leaders, according to the complaint, have declared that "all ... foreigners, known as internationalists, would be considered enemy targets" and have "described the internationalists as 'part of the enemy.'" Complaint at ¶ 17. The complaint further alleges that, since the Contras announced the targeting of "internationalists," numerous foreigners working in various social projects in Nicaragua have in fact been victims of Contra military operations. In the present posture of the case, we must accept all plausible allegations in the complaint as true.

## II. DISCUSSION

### A. The Political Question Doctrine

"No branch of the law of justiciability is in such disarray as the doctrine of the 'political question.'" C. Wright, *The Law of Federal Courts* 74 (4th ed. 1983). Professor Wright concludes that "there is no workable definition of characteristics that distinguish political questions from justiciable questions, and ... the category of political questions is 'more amenable to description by infinite itemization than by generalization.'" *Id.* at 75 (footnote omitted). The Supreme Court has voiced a similar sentiment, warning us that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). Given the care with which the political question doctrine should be applied and given the variety of claims encompassed by the present case, we find the trial court's blanket invocation of the political question doctrine to be inappropriate.

To the extent that political question cases contain factors that make them genuinely nonjusticiable, some of those elements can be found here. For example, judicial refusal to resolve political questions "is founded primarily on the doctrine of separation of powers." C. Wright, *supra,* at 75. Courts often underscore this factor by pointing to "a textually demonstrable constitutional commitment of the issue to a coordinate branch of government." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710; see also L. Tribe, *American Constitutional Law* 96 (2d ed. 1988) (distinguishing the textual commitment rationale as the "classical" version of the political question doctrine). As the trial court noted in this case, foreign policy decisions

are the subject of just such a textual commitment. "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918). Together, those departments possess the sole power to enter into treaties and subsequently to alter them. *See Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1887) ("Congress may modify [treaty] provisions, so far as they bind the United States"). Similarly, only the political departments can submit our nation to an international court's jurisdiction or thereafter rescind that commitment.

This facet of the political question doctrine may well bar consideration of some appellants' claims. The first two groups of appellants comprise organizations seeking to strengthen the United Nations and to help the citizens of Nicaragua. These organizations' claims seem especially vulnerable to dismissal under a doctrine that "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the [political branches]." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Indeed, to the extent that the organizational appellants in this case allege "purely ideological interests in the agency's action," *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C. Cir.1986), they may even lack standing.

▆▆▆ In other respects, however, applying the political question doctrine even to these first two categories of claims may not be the best approach. First, reliance on this doctrine should not depend on what type of party raises an issue or on the interest that party asserts; "[t]he doctrine ... is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. Secondly, the central premise of these first two groups of claims—that private parties can enforce an ICJ judgment against the United States—invites dismissal for a reason more fundamental than the political question doctrine. Neither individuals nor organizations have a cause of action in an American court to enforce ICJ judgments. The ICJ is a creation of national governments, working through the U.N.; its decisions operate between and among such governments and are not enforceable by individuals having no relation to the claim that the ICJ has adjudicated—in this case, a claim brought by the government of Nicaragua. Appellants try to sidestep this difficulty by alleging that our government has violated international law rather than styling their suit as an enforcement action in support of the ICJ judgment. The United States' contravention of an ICJ judgment may well violate principles of international law. But, as we demonstrate below, those violations are no more subject to challenge by private parties in this court than is the underlying contravention of the ICJ judgment. For these reasons, we do not rest on the political question doctrine in rejecting the claims brought by these first two groups of appellants. *See Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 206 (D.C.Cir.1985). Rather, we dismiss these claims on the ground that private parties have no cause of action in this court to enforce an ICJ decision.

The third and final group of claims in this case is brought by those appellants who allege infringement of their personal liberty and property rights. The trial court's determination that these claims raise political questions is troubling. This court's recent warning about the political question doctrine applies to the case before us with special force: the doctrine's "shifting contours and uncertain underpinnings" make it "susceptible to indiscriminate and overbroad application to claims properly before the federal courts." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C.Cir.1984) (en banc), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).

To be sure, even those appellants who advance claims based on personal rights persist in mingling those claims with an attempt to enforce the ICJ judgment. Nonetheless, the core of this third set of claims

lies in the fifth amendment. Appellants contend that funding of the Contras deprives them of liberty and property "without due process of law" not only because they are generally threatened by the war in Nicaragua but also because they are intended targets of the Contra "resistance." These are serious allegations and not ones to be dismissed as nonjusticiable. As our court declared in rejecting a political question defense to a fifth amendment takings claim, "[t]he Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry." *Ramirez de Arellano*, 745 F.2d at 1515. As appellants point out, the Supreme Court has repeatedly found that claims based on such rights are justiciable, even if they implicate foreign policy decisions. *See, e.g., Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

Notwithstanding the fact that appellants' claims of infringed rights are justiciable, however, we find the claims themselves to be insufficient as a matter of law. Examining the factual pleadings closely, we find no allegation that the United States itself has participated in or in any way sought to encourage injuries to Americans in Nicaragua. We therefore conclude that appellants' fifth amendment cause of action fails to state a claim on which relief can be granted. On that basis, we dismiss this final group of appellants' claims.

## B. Appellants Have No Basis in Domestic Law for Enforcing the ICJ Judgment

### 1. *The status of international law in the United States' domestic legal order*

■ Appellants argue that the United States' decision to disregard the ICJ judgment and to continue funding the Contras violates three types of international law. First, contravention of the ICJ judgment is said to violate part of a United States treaty, namely Article 94 of the U.N. Charter. That article provides that "[e]ach Member of the United Nations undertakes to comply with the decision of the International Court of Justice in any case to which it is a party." U.N. Charter art. 94. Second, disregard of the ICJ judgment allegedly violates principles of customary international law. One such principle holds that treaties in force shall be observed. Appellants contend that another such principle requires parties to ICJ decisions to adhere to those decisions. Third, the United States may have violated peremptory norms of international law. Such norms, often referred to as *jus cogens* (or "compelling law"), enjoy the highest status in international law and prevail over both customary international law and treaties. Appellants' contention that the United States has violated *jus cogens* forms their primary argument before this court. They contend that the obligation of parties to an ICJ judgment to obey that judgment is not merely a customary rule but actually a peremptory norm of international law.

■ For purposes of the present lawsuit, the key question is not simply whether the United States has violated any of these three legal norms but whether such violations can be remedied by an American court or whether they can only be redressed on an international level. In short, do violations of international law have domestic legal consequences? The answer largely depends on what form the "violation" takes. Here, the alleged violation is the law that Congress enacted and that the President signed, appropriating funds for the Contras. When our government's two political branches, acting together, contravene an international legal norm, does this court have any authority to remedy the violation? The answer is "no" if the type of international obligation that Congress and the President violate is either a treaty or a rule of customary international law. If, on the other hand, Congress and the President violate a peremptory norm (or *jus cogens*), the domestic legal consequences are unclear. We need not resolve this uncertainty, however, for we find that the principles appellants characterize as

peremptory norms of international law are not recognized as such by the community of nations. Thus, as we explain below in greater detail, none of the claims that appellants derive from violations of international law can succeed in this court.

### 2. *The effect of subsequent statutes upon prior inconsistent treaties*

■ Although appellants' complaint alleges that Congress' funding of the Contras violates Article 94 of the U.N. Charter, *see* Complaint at ¶¶ 34, 36–38, appellants seem to concede here that such a claim is unavailing. They acknowledge, as they must, that "[o]rdinarily, treaty obligations may be overridden by subsequent inconsistent statutes." Brief for Appellants at 32. Nonetheless, allegations concerning the violation of Article 94 resurface at several points in appellants' arguments, and we therefore briefly canvass the precedents that foreclose such claims.

In the *Head Money Cases,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), shipping companies protested payment of a tax on immigrants they had transported to America, arguing that the tax violated treaties of friendship with the immigrants' nations of origin. The Court held that, even if the statute requiring the tax was inconsistent with prior treaties, it necessarily displaced any conflicting treaty provisions for purposes of domestic law.

> A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined....
>
> But even [so] ... there is nothing in [a treaty] which makes it irrepealable or unchangeable. The Constitution gives it no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date....
>
> ....
>
> In short, we are of the opinion that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to

such acts as Congress may pass for its enforcement, modification, or repeal.

*Id.* at 598–99, 5 S.Ct. at 253–54; *see also Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). No American court has wavered from this view in the subsequent century. Indeed, in a comparatively recent case, our court reaffirmed the principle that treaties and statutes enjoy equal status and therefore that inconsistencies between the two must be resolved in favor of the *lex posterior.* In *Diggs v. Shultz,* 470 F.2d 461 (D.C.Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973), this court reviewed a claim by citizens of what was then Southern Rhodesia, assailing the United States' failure to abide by U.N. Security Council Resolution 232. That resolution directed U.N. members to impose a trade embargo against Rhodesia. The court found that America's contravention of Resolution 232 was required by Congress' adoption of the so-called Byrd Amendment "whose purpose and effect ... was to detach this country from the U.N. boycott of Southern Rhodesia in blatant disregard of our treaty undertakings." *Id.* at 466. "Under our constitutional scheme," the court concluded, "Congress can denounce treaties if it sees fit to do so, and there is nothing the other branches of government can do about it ... [; thus] the complaint [states] no tenable claim in law." *Id.* at 466–67.

■ These precedents dispose of any claim by appellants that the United States has violated its treaty obligation under Article 94. It is true, of course, that the facts here differ somewhat from the situation in *Diggs.* Congress has not clearly repudiated the requirement in Article 94 that every nation comply with an ICJ decision "in any case to which it is a party." U.N. Charter, art. 94. Rather, our government asserts that it never consented to ICJ jurisdiction in cases like the Nicaragua dispute. Thus, Congress may well believe that its support for the Contras, while contravening the ICJ judgment, does not violate its treaty obligation under Article 94. And, unless Congress makes clear its intent to abrogate a treaty, a court will not lightly infer such

intent but will strive to harmonize the conflicting enactments. *See Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933).

At this stage of the present case, however, the key question is not whether Congress intended to abrogate Article 94. Since appellants *allege* that Congress has breached Article 94, we must determine whether such a claim could ever prevail. The claim could succeed only if appellants could prove that a prior treaty—the U.N. Charter—preempts a subsequent statute, namely the legislation that funds the Contras. It is precisely that argument that the precedents of the Supreme Court and of this court foreclose. We therefore hold that appellants' claims based on treaty violations must fail.

Our conclusion, of course, speaks not at all to whether the United States has upheld its treaty obligations under international law. As the Supreme Court said in the *Head Money Cases*, a treaty "depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations ... [but] with all this the judicial courts have nothing to do and can give no redress." 112 U.S. at 598, 5 S.Ct. at 253. This conclusion reflects the United States' adoption of a partly "dualist"—rather than strictly "monist"—view of international and domestic law. "[D]ualists view international law as a discrete legal system [which]... operates wholly on an inter-nation plane." Henkin, *The Constitution and United States Sovereignty: A Century of Chinese Exclusion and Its Progeny*, 100 Harv.L. Rev. 853, 864 (1987) (hereinafter Henkin, *United States Sovereignty*); *cf.* 1 L. Oppenheim, *International Law* 35–44 (H. Lauterpacht 8th ed.1955).

It is uncertain whether either our republican form of government or our constitution's supremacy clause requires this subordination of treaties to inconsistent domestic statutes. *See, e.g.*, Henkin, *International Law as Law in the United States*, 82 Mich.L.Rev. 1555, 1565 n. 34 (1984) (noting that in several European countries treaties prevail over all inconsistent statutes). Nevertheless, the "[Supreme] Court's jurisprudence about treaties inevitably reflects certain assumptions about the relation between international law and United States law...." Henkin, *United States Sovereignty*, 100 Harv.L.Rev. at 870. Given that dualist jurisprudence, we cannot find—as a matter of *domestic* law—that congressional enactments violate prior treaties.

■ Finally, we note that even if Congress' breach of a treaty were cognizable in domestic court, appellants would lack standing to rectify the particular breach that they allege here. Article 94 of the U.N. Charter simply does not confer rights on private individuals. Treaty clauses must confer such rights in order for individuals to assert a claim "arising under" them. *See* U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1331 (1982). Whether a treaty clause does create such enforcement rights is often described as part of the larger question of whether that clause is "self-executing." *See, e.g.*, Riesenfeld, *The Doctrine of Self-Executing Treaties and U.S. v. Postal: Win At Any Price?*, 74 Am.J. Int'l L. 892, 896–97 (1980) (question whether a particular treaty requires implementing legislation is different from the international law question of whether treaty "aims at the immediate creation of rights and duties of private individuals which are enforceable," but both questions are part of the "concept of self-executing treaties"); *cf.* Restatement (Third) of Foreign Relations Law § 111 comment h (1987) (question of treaty's self-executing nature is "distinct from whether the treaty creates private rights or remedies").

This court has noted that, in "determining whether a treaty is self-executing" in the sense of its creating private enforcement rights, "courts look to the intent of the signatory parties as manifested by the language of the instrument." *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.Cir. 1976). The court in *Diggs v. Richardson*

concluded that the U.N. Security Council Resolution that plaintiffs sought to enforce (which barred commercial relations between U.N. members and Namibia) was "not addressed to the judicial branch of our government." *Id.* The resolution's provisions did not "by their terms confer rights upon individual citizens [but] call[ed] upon governments to take certain actions." *Id.; see also Islamic Republic of Iran v. Boeing Co.,* 771 F.2d 1279, 1283 (9th Cir.1985), *cert. dismissed,* 479 U.S. 957, 107 S.Ct. 450, 93 L.Ed.2d 397 (1986). Applying the same test to Article 94 of the U.N. Charter, we reach a similar conclusion.

The second paragraph of Article 94 provides that,

[i]f any party to a case fails to perform the obligations incumbent upon it under a judgment rendered by the [ICJ], the other party may have recourse to the Security Council, which may, if it deems necessary, make recommendations or decide upon measures to be taken to give effect to the judgment.

U.N. Charter art. 94, para. 2. Because only nations can be parties before the ICJ, appellants are not "parties" within the meaning of this paragraph. Clearly, this clause does not contemplate that individuals having no relationship to the ICJ case should enjoy a private right to enforce the ICJ's decision. Our interpretation of Article 94 is buttressed by a related provision in the Statute of the ICJ, which is incorporated by reference in the U.N. Charter. *See* U.N. Charter art. 92. The Statute provides that "[t]he decision of the Court has no binding force except between the parties and in respect of th[e] particular case." Statute of the International Court of Justice, June 26, 1945, art. 59, 59 Stat. 1031, T.S. No. 993, 1 U.N.T.S. xvi (hereinafter "ICJ Statute"). Taken together, these Charter clauses make clear that the purpose of establishing the ICJ was to resolve disputes *between national governments.* We find in these clauses no intent to vest citizens who reside in a U.N. member nation with authority to enforce an ICJ decision against their own government. The words of Article 94 "do not by their terms confer rights upon individual citizens; they

call upon governments to take certain action." *Diggs v. Richardson,* 555 F.2d at 851. We conclude that appellants' attempt to enjoin funding of the Contras based on a violation of Article 94 would fail even if Congress' abrogation of treaties were cognizable in domestic courts.

3. *Customary international law and subsequent inconsistent statutes*

In addition to relying on Article 94 to challenge continued funding of the Contras, appellants also invoke the rule "of customary international law that nations must obey the rulings of an international court to whose jurisdiction they submit." Brief for Appellants at 34. We accept that some version of this rule describes a norm of customary international law. *See, e.g.,* S. Rosenne, *The Law and Practice of the International Court of Justice* 127 (2d ed.1985). Even so, it is far from clear that this rule governs situations like the present one, in which a nation that has consented in advance to the Court's jurisdiction disputes whether the terms of that consent extend to a particular case. *Cf.* ICJ Statute art. 36, para. 6 ("dispute as to whether the [ICJ] has jurisdiction ... shall be settled by decision of the Court"). We postpone consideration of this issue, however, until our discussion of peremptory norms of international law. For the moment, we assume *arguendo* that Congress' decision to disregard the ICJ judgment violates customary international law.

■ The question is whether such a violation is cognizable by domestic courts. Once again, the United States' rejection of a purely "monist" view of the international and domestic legal orders shapes our analysis. Statutes inconsistent with principles of customary international law may well lead to international law violations. But within the domestic legal realm, that inconsistent statute simply modifies or supersedes customary international law to the extent of the inconsistency. Although the Supreme Court has never articulated this principle as a firm holding, the Court's persuasive dictum in an important early

case established the principle that this and other courts follow.

In *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), the owner of fishing vessels captured and condemned as prize during the Spanish–American War sought compensation from the United States on the ground that customary international law prohibited such seizures. After canvassing prior state practice and the opinions of commentators, the Court concluded that the prohibition against seizure of boats engaged in coastal fishing, which arose at first from considerations of comity between nations, had ripened into "an established rule of international law." *Id.* at 708, 20 S.Ct. at 302. The Court therefore held that the condemnation was improper because "international law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction." *Id.* at 700, 20 S.Ct. at 299.

Justice Gray, writing for the Court, qualified this famous statement about the domestic effect of international law with dictum of no less significance: "[W]here there is no treaty, and no controlling executive *or legislative act* or judicial decision, resort must be had to the customs and usages of nations." *Id.* (emphasis added); *see also The Nereide*, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815) (per Marshall, C.J.) (dictum to same effect). Thus, so far as concerned domestic law, the rule was laid down that subsequently enacted statutes would preempt existing principles of customary international law—just as they displaced prior inconsistent treaties.

Our own court adopted this dictum as part of its holding in *Tag v. Rogers*, 267 F.2d 664 (D.C. Cir.1959), *cert. denied*, 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed.2d 555 (1960). In that case, a German national sought to reclaim property in America that had been vested in the United States Attorney General during World War II, pursuant to the Trading With the Enemy Act. The plaintiff asserted, *inter alia*, "that there is now a practice amounting to an authoritative declaration of international law forbidding the seizure or confiscation of the property

of enemy nationals during time of war, at least in the case of property acquired by the enemy national before the war." *Id.* at 666. Citing *The Paquete Habana*, our court rejected plaintiff's contention: "Whatever force appellant's argument might have in a situation where there is no applicable treaty, statute, or constitutional provision, it has long been settled in the United States that the federal courts are bound to recognize any one of these three sources of law as superior to canons of international law." *Id.*

Few other courts have had occasion to consider the principle that, under domestic law, statutes supersede customary international law. But the principle is implicit in decisions that uphold the statutory abrogation of treaties, "since violation of a treaty is essentially a violation of the principle of customary international law requiring that treaties be observed." L. Henkin, *Foreign Affairs and the Constitution* 460 n. 61 (1972).

 As with their refusal to take notice of statutory abrogation of treaties, the courts' disregard of statutory breaches of customary international law is not necessarily required by the Constitution. In Professor Henkin's view, "[t]he framers of the Constitution respected the law of nations, and it is plausible that they expected the political branches as well as the courts to give effect to that law. Other countries ... give effect to international law over domestic legislation." Henkin, *United States Sovereignty*, 100 Harv.L.Rev. at 877 (footnotes omitted) (citing constitutions of West Germany, Italy, and Greece). Nonetheless, the law in this court remains clear: no enactment of Congress can be challenged on the ground that it violates customary international law. Those of appellants' claims that are predicated on this theory of illegality cannot succeed.

### 4. *Peremptory norms of international law (jus cogens)*

Appellants argue that the rule requiring parties who have submitted to an international court to abide by its judgment is not only a principle of customary international

law but has become a form of *jus cogens.* Because such peremptory norms are nonderogable and enjoy the highest status within international law, appellants conclude that these norms are absolutely binding upon our government as a matter of domestic law as well. Indeed, appellants assert that "the obligation stemming from the ICJ judgment ... is such that it rises to the level of a constitutional obligation, which *cannot* be overridden by statute." Brief for Appellants at 32–33 (emphasis in original).

Appellants cite no authority for this assertion that a peremptory norm of international law operates domestically as if it were a part of our Constitution. So far as we know, no federal court has ever considered the concept—much less the domestic effect—of *jus cogens.* The Vienna Convention on the Law of Treaties, which reflects the common understanding of the term, defines *jus cogens* only in relation to *international* law: "A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law ... [which] is a norm accepted by the international community of States as a whole as a norm from which no derogation is permitted...." Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, U.N.Doc. A/Conf. 39/27, 8 I.L.M. 679 (hereinafter "Vienna Convention"); *see also* Verdross, *Jus Dispositivum and Jus Cogens In International Law,* 60 Am.J. Int'l L. 55 (1960).

We need not decide whether an ICJ judgment would restrict Congress' foreign affairs power if that judgment were in fact a peremptory norm of international law. ICJ judgments simply do not meet the Vienna Convention's—or any other authority's—definition of *jus cogens.* To see why, it is useful to clarify the criteria that determine when a rule becomes not only a customary but also a peremptory norm of international law.

"Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of Foreign Relations Law § 102(2) (1987) (hereinafter *"Restatement"*). Thus, customary international law is continually evolving. At a crucial stage of that process, "[w]ithin the relevant states, the will has to be formed that the rule will become law if the relevant number of states who share this will is reached." Meijers, *How Is International Law Made?,* 9 Netherlands Y.B. Int'l L. 3, 5 (1978). As to what constitutes the necessary number of "relevant states," the ICJ has said that "State practice ... should have been both extensive and virtually uniform in the sense of the provision invoked." *The North Sea Continental Shelf Case (Judgment),* 1969 I.C.J. 12, 43. Finally, in order for such a customary norm of international law to become a peremptory norm, there must be a further recognition by "the international community ... *as a whole* [that this is] a norm from which no derogation is permitted." Vienna Convention art. 53 (emphasis added); *see also* Gaja, *Jus Cogens Beyond the Vienna Convention,* 172 Hague Acad. Recueil des Cours 271, 283–87 (1981).

Given these standards, it is clear that an ICJ judgment of the sort that was rendered against the United States in the Nicaragua case does not rise to the level of *jus cogens.* This conclusion rests in part on an understanding of the different types of jurisdiction that the ICJ exercises in contentious cases. On the one hand, the court adjudicates disputes that are submitted to it by all of the parties, pursuant to a "special agreement." This agreement is often embodied in a clause of a multilateral or bilateral treaty, referring disputes that arise under the treaty to the ICJ. *See* S. Rosenne, *The Law and Practice of the International Court* 333–34 (2d ed.1985). On the other hand, the ICJ also takes jurisdiction of cases upon unilateral application, when the court finds that the nonapplying party to the dispute has already consented to jurisdiction. Such prior consent to jurisdiction may be found in the type of treaty clause already discussed. But it may also be given by means of a declaration, deposited with the Secretary General of the U.N., in which a nation agrees to have the ICJ adjudicate legal disputes that arise with another nation that has filed a similar dec-

laration. ICJ Statute art. 36, para. 2. Adjudication of disputes pursuant to such prior unilateral consent is described as an exercise of the ICJ's "compulsory" jurisdiction. In the present case, the ICJ found that the United States' 1946 declaration, submitting to the ICJ's compulsory jurisdiction, did extend to the Nicaragua dispute. The United States objected that its consent did not apply to such cases of "armed conflict."

Fewer than a third of the U.N.'s member nations have filed unilateral declarations consenting to compulsory jurisdiction, and many of these have imposed significant reservations on the scope of their consent. *See* Scott & Carr, *The ICJ and Compulsory Jurisdiction: The Case For Closing The Clause,* 81 Am.J.Int'l L. 57, 58 (1987). More to the point, "[i]n the 1970s and 1980s, the Court's compulsory jurisdiction cases have been beset with non-appearing defendants." Janis, *Somber Reflections on the Compulsory Jurisdiction of the International Court,* 81 Am.J.Int'l L. 144 (1987) (citing nonappearance in a case or disregard of a judgment by Iceland, France, Turkey, Iran (twice), and Albania). One scholar concludes that "States do not yet seem to have reached a stage where they are prepared to submit their disputes to international adjudication." J. Elkind, *Non–Appearance Before the International Court of Justice* xiv (1984). Our conclusion need not sweep so broadly. In special agreement cases—in which both parties to a dispute simultaneously submit to the ICJ's jurisdiction—adherence to the Court's judgment may well be the norm. But in cases of unilateral application, in which one nation is hailed into Court on the basis of a prior consent whose scope it disputes, the record of compliance is much more uneven. We conclude there is no evidence that an ICJ judgment, in a case of general compulsory jurisdiction, represents "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted." Vienna Convention art. 53.

Our conclusion is strengthened when we consider those few norms that arguably do meet the stringent criteria for *jus cogens.*

The recently revised *Restatement* acknowledges two categories of such norms: "the principles of the United Nations Charter prohibiting the use of force," *Restatement* § 102 comment k, and fundamental human rights law that prohibits genocide, slavery, murder, torture, prolonged arbitrary detention, and racial discrimination. *Id.* § 702 & comment n; *see also* Randall, *Universal Jurisdiction Under International Law,* 66 Tex.L.Rev. 785, 830 (1988); Whiteman, *Jus Cogens In International Law, With a Projected List,* 7 Ga.J.Int'l & Comp.L. 609, 625–26 (1977). *But see Restatement* § 331 comment e (doctrine of *jus cogens* is of such "uncertain scope" that a "domestic court should not on its own authority refuse to give effect to an agreement on the ground that it violates a peremptory norm").

Such basic norms of international law as the proscription against murder and slavery may well have the domestic legal effect that appellants suggest. That is, they may well restrain our government in the same way that the Constitution restrains it. If Congress adopted a foreign policy that resulted in the enslavement of our citizens or of other individuals, that policy might well be subject to challenge in domestic court under international law. Such a conclusion was indeed implicit in the landmark decision in *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), which upheld jurisdiction over a suit by a Paraguayan citizen against a Paraguayan police chief for the death by torture of the plaintiff's brother. The court concluded that "official torture is now prohibited by the law of nations." *Id.* at 884 (footnote omitted). The same point has been echoed in our own court. Judge Edwards observed in *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir. 1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), that "commentators have begun to identify a handful of heinous actions—each of which violates definable, universal and obligatory norms," *id.* at 781 (Edwards, J., concurring), and that these include, at a minimum, bans on governmental "torture, summary execution, genocide, and slavery." *Id.* at 791 n.

20; *see also Letelier v. Republic of Chile,* 488 F.Supp. 665 (D.D.C.1980) (upholding jurisdiction over claim that foreign government brought about assassination of its own citizen living in the United States, in violation of international law and the U.S. Constitution).

 We think it clear, however, that the harm that results when a government disregards or contravenes an ICJ judgment does not generate the level of universal disapprobation aroused by torture, slavery, summary execution, or genocide. Appellants try to bootstrap the ICJ's judgment against the United States into a form of *jus cogens* by pointing out that the judgment *relies* on a peremptory norm of international law—that is, that the ICJ invoked the norm proscribing aggressive use of force between nations when it rendered its decision in the Nicaragua case. This argument, however, confuses the judgment itself with the ICJ's rationale for that judgment. The gravamen of appellants' complaint is that compliance with an ICJ judgment is a nonderogable norm of international law, not that a particular judgment constitutes collateral estoppel against the United States as to its violation of a nonderogable norm. Were appellants to advance the latter contention, they would be applying nonmutual, offensive collateral estoppel against the federal government, which generally is not permitted even in domestic law cases, *see United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), much less in international law cases where our government disputes the prior court's jurisdiction. In sum, appellants' attempt to enjoin funding of the Contras on the ground that it violates a peremptory norm of international law by contravening an ICJ judgment is unavailing. The ICJ judgment does not represent such a peremptory norm.

## C. Claims Arising Under the APA

 The foregoing discussion disposes of those among appellants' claims that de-

rive from the U.N. Charter itself or from doctrines of international law. However, appellants also allege a cause of action under the Administrative Procedure Act ("APA"). The APA assures judicial review (unless otherwise precluded by law) for persons "suffering legal wrong because of agency action," 5 U.S.C. § 702 (1982), and provides that courts will "set aside agency action ... not in accordance with law." *Id.* § 706. Presumably, the agency action that appellants challenge is the disbursement of funds to the Contras, under the State Department's "coordination and supervision." Military Construction Appropriations Act for Fiscal Year 1987, Pub.L. No. 99–500, § 101(k), 100 Stat.1783 (1986). Inasmuch as the United States' aid to the Contras contravenes the ICJ judgment and allegedly leads to appellants' injuries, appellants claim to be "suffering legal wrong" from action "not in accordance with law." One "law" that the government's action is allegedly "not in accordance with" is the United States' treaty obligation under the U.N. Charter. But as we have already shown, Congress' violation of this "law" is not cognizable in American court.

 Appellants also allege, however, that agency action is "not in accordance with law" if it contravenes an ICJ judgment. We think this argument is foreclosed both by the nature of ICJ judgments and by the scope of the APA. In the first place, we have already noted that the intended effect of ICJ judgments is expressly circumscribed. The statute governing the ICJ provides that "decision[s] of the Court ha[ve] no binding force except between the parties and in respect of that particular case." ICJ Statute art. 59. The ICJ itself, in other words, does not aspire to regulate the actions of the United States toward its own citizens. ICJ judgments thus resist importation into American law as substantive legal standards for reviewing agency actions.

 In theory, a law such as the APA could supersede these limitations in the ICJ

statute, transforming ICJ decisions into legal standards for domestic judicial review. But, as Professor Davis explains, the APA does not possess such generative capacity. "Because the APA provision on reviewability is *always* dependent on other law, the law of reviewability is essentially the same as it would be without any APA provision." 5 K. Davis, *Administrative Law Treatise* § 28.1, at 256 (2d ed. 1984) (emphasis in original); *see also id.* at § 29.1. In sum, the APA does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law.

D. Claims Arising Under the Fifth Amendment

Appellants' final argument for enforcing the ICJ judgment is that continued funding of the Contras violates appellants' fifth amendment rights. This claim appears to be framed in two different ways. The first variant combines the fifth amendment with various forms of international law that we have already encountered. Appellants' second variant rests solely on fifth amendment jurisprudence.

1. *The fifth amendment conjoined with principles of international law*

Since the Contras' deprivation of appellants' liberty and property is partly funded by the United States government, appellants claim that the government itself has inflicted the deprivation. They further allege that this deprivation "is arbitrary and unreasonable in that it is in violation of Article 94 of the United Nations Charter and is in violation of customary international law as set forth by the ICJ." Complaint at ¶ 36. The allegation of "arbitrary" conduct is crucial to appellants' claim because the "touchstone of [fifth amendment] due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

■ This attempt to convert putative violations of international law into violations of the fifth amendment suffers several defects. To begin with, since we have already determined that Congress' violation of a treaty is not cognizable in domestic court, we cannot find that activities that Congress has funded are "arbitrary and unreasonable" (and thus proscribed under the fifth amendment) by virtue of being "in violation of Article 94 of the United Nations Charter." Complaint at ¶ 36. Similarly, we have already determined that (1) even if customary international law requires adherence to ICJ judgments, Congress' violation of that law is not domestically cognizable; (2) an ICJ judgment, by its own terms, operates only between the national governments that are parties to that judgment; and (3) as a matter of domestic law, collateral estoppel from a prior court judgment cannot be used in a nonmutual, offensive fashion against the federal government. For these very reasons, we must reject appellants' argument that Congress' funding of the Contras violates the fifth amendment solely because it "is in violation of customary international law as set forth by the ICJ." *Id.*

■ Even if Congress' contravention of the ICJ judgment were somehow cognizable under the due process clause, such a contravention could not—by itself—transform appellants' injuries into fifth amendment violations. In other words, we disagree with appellants' implicit view that, whenever the government violates a legal norm and that violation coincides with injury to liberty or property interests, a due process violation necessarily results. The standard for what constitutes arbitrary government action under the fifth amendment is by no means so the fifth amendment is by no means so formulaic. Substantive due process doctrine does not protect individuals from all actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents "governmental power from being 'used for purposes of oppression,'" *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d

662 (1986) (citation omitted), or "abuse of government power that shocks the conscience." *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981), or action that is "legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." *Kindem v. City of Alameda,* 502 F.Supp. 1108, 1113–14 (N.D.Cal.1980).

Few if any cases illustrate the point that not all injuries involving violations of federal law are also violations of the fifth amendment. The barrier of sovereign immunity may explain the dearth of such precedents. However, several cases involving claims against state officials under 42 U.S.C. § 1983 support our view that appellants have misconstrued due process doctrine. The Seventh Circuit, for example, has held that "[t]he alleged violation of state law does not *per se* result in a violation of [substantive due process]. In order for the violation to rise to the level of a federal constitutional violation, it must be alleged that the violation was the result of *arbitrary state action." United States ex rel. Hoover v. Franzen,* 669 F.2d 433, 445 (7th Cir.1982) (emphasis added); *see also Smith v. City of Picayune,* 795 F.2d 482, 488 (5th Cir.1986). Because the fact of a state law violation does not resolve whether a plaintiff has been deprived of due process, the manner in which the violation occurs as well as its consequences are crucial factors to be considered.

■ Of course, a state official's violation of state law and Congress' disregard of international law are quite different events. But there are reasons why courts should treat these events similarly under the fifth amendment. A major factor in courts' refusal to transform a state agency's violation of state law into a *per se* violation of due process is their concern for federalism and the risk of constitutionalizing every error of state administration. *Stern v. Tarrant County Hosp. Dist.,* 778 F.2d 1052, 1059–60 (5th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). We have a similar motive in declining to convert the violation

of an ICJ judgment or a putative violation of international law into a *per se* violation of due process. Our approach reflects concern about separation of powers and a reluctance to constitutionalize foreign policy choices that are committed to the political branches of government. At a minimum, then, an assessment of whether Congress' violation of an international legal norm also violates the fifth amendment must take into account the manner and consequences of Congress' allegedly illegal action.

■ The circumstances surrounding Congress' decision to disregard the ICJ judgment foreclose any conclusion that Congress thus acted "arbitrarily" against appellants. The United States fully contested the ICJ's jurisdiction in the Nicaragua conflict, invoking applicable principles of international law. When the U.S. government withdrew from the ICJ proceedings in the merits phase of the case, it did so because of a firmly stated view that (1) Nicaragua had not itself consented to, and therefore could not invoke, ICJ jurisdiction; (2) the dispute with Nicaragua was one involving "armed conflict," collective self-defense and preservation of regional stability, and thus fell outside the ICJ's jurisdiction as set forth in the U.N. Charter and in the ICJ's own precedents; and (3) the United States itself had never consented to jurisdiction over this type of conflict since, by reservation, it had expressly excluded "disputes arising under multilateral treaty" from the scope of its consent. *See* Statement On The U.S. Withdrawal From the Proceedings Initiated By Nicaragua In The International Court of Justice, *reprinted in* 24 I.L.M. 246 (1985). This objection to the ICJ's jurisdiction was followed by the joint determination of Congress and the President that, notwithstanding the recent ICJ decision, continued funding of the Contras was essential to the national security interests of the United States. *See* Military Construction Appropriations Act for Fiscal Year 1987, Pub.L. No. 99–500, § 101(k), 100 Stat. 1783, 1783–300 (1986).

The United States' justifications for disregarding the ICJ judgment may or may

not pass muster under international law. But as a matter of domestic law, these justifications refute any claim that Congress and the President acted so arbitrarily as to transform the resulting harm to appellants into denials of due process. We do not say that, whenever Congress and the President jointly pursue a foreign policy, the impact on individual citizens will inevitably comport with due process. We merely reject appellants' claim that the government acted "arbitrarily" toward them, in violation of their fifth amendment rights, *solely* because it contravened the ICJ judgment.

Finally, appellants' bid to convert a violation of the ICJ judgment into a violation of the fifth amendment fails because the ICJ judgment involves legal principles entirely unrelated to the due process clause. Appellants allege that the United States has injured its own citizens, a claim that the ICJ never considered. Rather, the ICJ held that the United States breached legal duties running between our nation's government and the government of Nicaragua. For example, the court found that by supporting the Contras the United States "has acted, against the Republic of Nicaragua, in breach of its obligation under customary international law not to intervene in the affairs of another State." 1986 I.C.J. at 146. The ICJ also concluded that acts by our government violated the duty "not to use force against another State," and the obligation "not to violate the sovereignty of another State." *Id.* at 147. The discrepancy between these principles of international law and appellants' claims that their government has violated their personal rights underscores the defect in appellants' contention that a violation of the ICJ judgment necessarily constitutes "arbitrary" action that violates their fifth amendment rights. For all of these reasons, we hold that the alleged violation of the ICJ judgment is not a sufficient predicate for a fifth amendment violation.

### 2. The fifth amendment ex proprio vigore

Appellants appear to offer a final claim that does not involve the ICJ judgment or principles of international law. Evidently, they contend that the harm inflicted on them and on their property by the Contras is unconstitutional, as a matter purely of fifth amendment law. Were the injuries complained of simply the result of appellants' proximity to a military conflict, it is doubtful that any constitutional claim would lie—even if America's own troops were responsible for the injuries. "Not every hurt by a state officer constitutes a [constitutional] violation...." *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981). Being caught in the crossfire of war does not amount to a deprivation of constitutional rights.

 Appellants allege, however, that the Contras have begun to target them as part of the enemy in Nicaragua. Were this type of *deliberate* action carried out by personnel of our government, it might well give rise to a claim for fifth amendment injury—notwithstanding its occurrence in a military conflict. "If the state officer's action [has] caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal," *id.,* then a due process violation is likely.

Appellants must demonstrate, however, that the United States' involvement in this targeting of Americans in *Nicaragua* is sufficient to constitute a due process violation *by our government.* Appellants' fifth amendment claim founders on this requirement; their complaint does not allege that the United States has participated in any way in the targeting of injuries against Americans or their property in Nicaragua. Nor do they allege that such injuries are intended consequences of our government's support for the Contras. To demonstrate the insufficiency of appellants' pleaded facts, we analyze the complaint in terms of two legal questions: (a) whether the Contras' activities qualify as "state action," and (b) whether our government's support

for the Contras is a constitutional tort in its own right.

### a. The absence of "state action"

It is well established that the fifth amendment "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (referring to fourteenth amendment). Due process "applies to actions of the federal government, not those of private individuals." *Gerena v. Puerto Rico Legal Servs.*, 697 F.2d 447, 449 (1st Cir. 1983). In certain cases, the government can be held responsible for actions by a private entity. Whether such liability arises in a given case is resolved under the so-called "state action" doctrine. "[A] private party's behavior must be instigated by or dependent upon the exercise of governmental authority to justify attribution of the consequences of that behavior to 'state action.'" *Franz v. United States*, 707 F.2d 582, 591 (D.C.Cir.1983). The word "state" is used in its generic sense; the doctrine governs liability for both state and federal government. *Id.* at n. 33.

The Supreme Court has relied on several factors to determine whether "state action" occurs in particular circumstances. None of the Court's various tests, however, is satisfied by the facts that appellants allege in their complaint. The only alleged fact that links our government to the actions that have harmed appellants is Congress' appropriation of money to the Contras for their continued "resistance" against the Nicaraguan government. The Supreme Court has expressly held that such government funding, by itself, does not suffice to convert actions by private parties into "state action." For example, in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), Medicaid patients claimed that doctors in private nursing homes reduced their benefits or medical care without procedural due process. The Court noted that,

although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or *has provided such significant encouragement, either overt or covert,* that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the [due process clause].

*Id.* at 1004–05, 102 S.Ct. at 2785–86 (citations omitted; emphasis added). Applying this standard to the facts in *Blum*, the Court absolved the government of responsibility for doctors' decisions to reduce patients' medical care. The Court reached this conclusion notwithstanding the fact that more than 90 percent of the nursing homes' patients were paid for by Medicaid and that the doctors' medical decisions were extensively regulated at both the state and federal levels. Regulations required, *inter alia*, that the patients' need for treatment be reevaluated periodically, that doctors use certain forms in making those evaluations, and that any reductions in medical care be reviewed by state officials before Medicaid benefits were correspondingly reduced. The Court nonetheless concluded that "this degree of involvement is too slim a basis on which to predicate a finding of state action in the [medical] decision itself." *Id.* at 1009, 102 S.Ct. at 2788.

In the present case, appellants do not allege any government participation in the private actions that have harmed them. They claim only that the government has facilitated those private actions by providing funds to the Contras. Unlike the situation in *Blum*, it is not even alleged that government officials have given "approval of or acquiesce[d] in," 457 U.S. at 1004, 102

S.Ct. at 2785, the challenged private actions. Indeed, as the government points out, Congress conditioned funding for the Contras on a certification by the President that the "Nicaraguan democratic resistance groups receiving assistance ... have agreed to and are beginning to implement ... the elimination of human rights abuses." Pub.L.No. 99–500, § 101(k), 100 Stat. 1783, 1783–302 (1986). We think *Blum* thus forecloses any conclusion that, solely because of United States support, the Contras' actions against appellants constitute "state action."

In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), decided the same day as *Blum,* the Court reviewed factors other than government funding and regulation that might convert private activities into "state action." None of these other factors is present in this case. For example, where the government has delegated a public function that is "traditionally the exclusive prerogative of the State," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974), the government may be responsible for seeing that the function is carried out lawfully. In addition, a government that enjoys a "symbiotic relationship" with a private entity may be liable for its wrongdoing. For example, in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), a restaurant that rented space in a commercial building owned by the city refused to serve black customers. The Court found that the "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Id.* at 724, 81 S.Ct. at 861.

The "public function" and "symbiotic relationship" tests for state action perform awkwardly, at best, in the realm of foreign relations. But to the extent these principles can be adapted to the facts of the present case, they reveal no sign of state action. Support for a rebel group in a foreign country scarcely constitutes delegation of a "public function" that would otherwise be performed by the United States. Nor, under the "symbiotic relationship"

test, can it be argued that the United States government benefits from the Contras' alleged attacks on American citizens.

The *Rendell–Baker* Court noted one other factor that can support a finding of state action by private parties. In a few cases, government officials have helped private parties carry out the constitutionally suspect action. Thus, in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), a creditor attached plaintiff's property without due process of law. Because a local sheriff executed the writ of attachment, the Court held that "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Id.* at 941, 102 S.Ct. at 2755. As we have already noted, appellants make no such claims of "joint participation" by United States personnel in the Contras' attacks on Americans in Nicaragua.

**b. The absence of a constitutional tort**

A court's determination that privately inflicted harm does not constitute "state action" would ordinarily conclude the inquiry as to whether the government itself violated the Constitution. Appellants seek to avoid that result, however, by sidestepping the state action issue. Rather than argue about the governmental character of the Contras' activities, appellants focus on the government's own action—namely, Congress' decision to fund the Contras. It is this action, according to appellants, that "directly, foreseeably, and necessarily increases the risk to the lives and security of U.S. citizens." Brief for Appellants at 16. Appellants thus raise the prospect that the government has committed tortious conduct by facilitating—or by failing to prevent—the Contras' infliction of harm. The key question, however, is whether this putatively tortious conduct by the government could rise to the level of a *constitutional* tort that violates due process. Most torts do not rise to that level.

The Supreme Court's decision in *Martinez v. California,* 444 U.S. 277, 100 S.Ct.

553, 62 L.Ed.2d 481 (1980), does suggest that liability for constitutional torts may arise despite the absence of state action. But the case also confirms the fact that only a narrow range of government acts give rise to constitutional torts in such circumstances. Plaintiffs' decedent in *Martinez* was murdered by a parolee; plaintiffs claimed that the parole board's negligent and reckless decision to parole the murderer violated the decedent's substantive due process rights. The Court relied initially on the absence of state action in rejecting plaintiffs' claims, noting that "the decision to release [the murderer] from prison was action by the State, [but] the action of [that person] five months later cannot be fairly characterized as state action." *Id.* at 284–85, 100 S.Ct. at 558–59.

The Court then considered whether a parole board could commit a constitutional tort, even in the absence of state action by the parolee. "We need not and do not decide," the Court said, "that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole.... [U]nder the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action...." *Id.* at 285, 100 S.Ct. at 559. The Court was willing to assume that, "as a matter of state tort law, the parole board could be said either to have had a 'duty' to avoid harm to [the] victim or to have proximately caused her death," but the Court concluded that "not every injury in which a state official has played some part is actionable under [section 1983 of the civil rights law]." *Id.*

The *Martinez* Court offered no test for determining which torts might rise to the level of a due process violation. Since *Martinez*, however, the Court has partly resolved this uncertainty, holding that mere negligence by governmental actors can never constitute a fifth amendment violation. In *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), a prisoner who had notified the warden of threatened injury from another inmate claimed that the warden's failure to protect him from the eventual injury violated his due process rights. The trial court found that the warden's failure to act on the prisoner's warning was negligent, but the Supreme Court concluded that "the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property," even though such negligence "in this case led to serious injury." *Id.* at 347, 106 S.Ct. at 670. Thus, to the extent that appellants allege negligence in the United States' funding of the Contras, their claim of constitutional injury must fail.

In a companion case to *Davidson*, however, the Supreme Court expressly reserved judgment on the question "whether something less than intentional conduct [but more than negligence], such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Daniels v. Williams*, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 667 n. 3, 88 L.Ed.2d 662 (1986). Appellants appear to raise this unresolved question in the present case. They do not specifically label the government's conduct as reckless, but they assert that "United States' aid to the contras ... directly, foreseeably, and necessarily increases the risk to the lives and security of U.S. citizens living in Nicaragua." Brief for Appellants at 16. This best approximates a claim of recklessness. Although the contours of "recklessness" in tort law remain somewhat unclear, "[t]he usual meaning ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." W. Prosser & W. Keeton, *Prosser and Keeton on Torts* § 34, at 213 (5th ed. 1984) (footnote omitted).

This court must decide, therefore, whether a foreign policy decision by Congress and the President, which might conceivably be characterized as reckless conduct toward appellants, could violate appellants' fifth amendment rights. We must bear in mind that—notwithstanding the Supreme Court's conclusion that negligent acts are excluded *per se* from the fifth amend-

ment's ambit—there is no reason to believe that all reckless acts similarly share one constitutional status. Rather, some reckless acts may constitute due process violations while others do not. This is clearly the case with intentional torts:

> the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery.... In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort ... or maliciously or sadistically for the very purpose of causing harm.

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *see also Rutherford v. City of Berkeley*, 780 F.2d 1444, 1446 (9th Cir.1986). Whether reckless conduct rises to the level of a due process violation must similarly depend on "whether the constitutional line has been crossed."

Appellants do not specify which duty of care underlies their claim of constitutional tort. Presumably, appellants rely on the principle that "[a]n act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of ·... a third person which is intended to cause harm." Restatement (Second) of Torts § 302 B (1965). In this case, the Contras are the "third person[s]" whose alleged acts against appellants are assertedly "intended to cause harm."

As with the challenged conduct in *Martinez*, the line between government "acts" and "omissions" in this case is somewhat murky. To be sure, appellants chiefly complain of affirmative acts, namely Congress' funding of the Contras. But they also contend that "without U.S. support, the contras would be unable to maintain their war against Nicaragua." Brief for Appellants at 17. They thus imply that, by failing to terminate aid to the Contras, Congress and the President have failed to pro-

tect appellants from dangerous persons who are, in some ultimate sense, under the United States' control. We evaluate both the "act" and "omission" bases for appellants' constitutional claim.

*Tortious Omissions:* Appellants do cite a few cases that hold (or at least suggest) that reckless failure to *prevent* privately inflicted injuries may violate due process. In these precedents, however, the government has been specially positioned to effect such prevention. For that reason, we are persuaded that appellants' allegations in the present case cannot support a due process claim. To see why the facts alleged in this case are insufficient as a matter of law, we compare this case with the other "recklessness" precedents.

Prominent among those precedents are cases in which prison officials fail to protect prisoners from other violent inmates. Such cases—some of them based on the eighth amendment's bar to cruel punishment, rather than the fifth amendment's guarantee of substantive due process—were noted by the dissent in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In *Davidson*, three of the Justices believed the warden's failure to protect the complaining prisoner from injury by another inmate exceeded the trial court's finding of negligence. They further believed that the challenged conduct constituted the sort of reckless action that deprived the plaintiff of liberty under the fourteenth amendment. Justice Blackmun concluded that "[r]ecklessness or deliberate indifference is all that a prisoner [should] need [to] prove to show ... a violation of the Due Process Clause." *Id.* at 358, 106 S.Ct. at 675 (Blackmun, J., dissenting).

Another factual situation in which reckless government conduct may violate the due process rights of someone injured by a private party is exemplified by *Nishiyama v. Dickson County*, 814 F.2d 277 (6th Cir. 1987). In that case, the court found plaintiffs had stated a justiciable claim against local sheriffs who did nothing to recapture a prisoner, after they learned that he was roving the county in a police car, stopping motorists. The convict allegedly stopped—

and then murdered—plaintiffs' decedent. Finally, the Supreme Court's decision in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), suggests another situation in which reckless failure to prevent injury might violate due process. In *Martinez*, as we noted, the Court left open the possibility that an egregious error in paroling a convict who posed too clear a threat, might violate the due process rights of someone subsequently victimized by the parolee.

In comparing the facts of these precedents to the facts that appellants allege, we find two major differences. First, in the cases we have just canvassed, the alleged recklessness was a failure to control persons whom the government clearly could restrain. The prisoner who was up for parole in *Martinez*, the felon who was let out on "trusty" status in *Nishiyama*, and the violent inmate who attacked another inmate in *Davidson*, were all subject to the plenary power of the state. When the government exercises that power recklessly, the resulting harm inflicted by persons in its care may more readily be attributed to the state itself. In addition, the courts in all three cases emphasized the relationship between the victim and the government or the victim and the prisoner who inflicted harm. In *Martinez*, for example, a crucial reason for the Court's rejection of the constitutional claim was that "the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger." 444 U.S. at 285, 100 S.Ct. at 559. By contrast, the *Nishiyama* court found "the radius of harm" threatened by the felon using the patrol car was "more distinct." 814 F.2d at 280. The court relied on the fact that "identification of potential victims became even easier once the sheriff's department was notified that its patrol car was stopping motorists in Montgomery County." *Id.* Finally, as Justice Blackmun pointed out in *Davidson*, the government bears a particular responsibility to the victim in prison cases since, by imprisoning him, the government "renders [the victim] vulnerable and strips him of his ability to defend himself." 474 U.S. at 355, 106 S.Ct.

at 674 (Blackmun, J., dissenting); *see also Washington v. District of Columbia*, 802 F.2d 1478, 1481 (D.C.Cir.1986) ("the state has a constitutional duty to protect those in its custody but no such duty to protect others").

The situation is very different when our government gives aid to a resistance movement in a foreign country. Appellants do not allege that the United States exercises the type of control over the Contra forces that prison officials exercise over inmates. Nor do they allege a special relationship between themselves and the government. Yet, "citizens have no constitutional right to be protected from attack by private third parties, absent some special relationship between the state and the victim or the criminal and the victim that distinguishes the victim from the general public ... [']even if the state was remiss in allowing the third person to be in a position in which he might cause harm to a member of the public....[']" *Ketchum v. Alameda County*, 811 F.2d 1243, 1247 (9th Cir.1987) (citation omitted); *see also* Restatement (Second) of Torts § 315 (1965) (there is no duty to prevent harm inflicted by third parties unless "a special relation exists"). "Such [special] relationships include parent-child, master-servant, possessor of land or chattels-licensee." *Bergmann v. United States*, 689 F.2d 789, 796 (8th Cir.1982).

The second factor that distinguishes the enumerated "recklessness" precedents from the case before us is closely related to the first: the course of conduct that appellants challenge as reckless has been consciously pursued by our government for independent reasons of foreign policy. Congress and the President appropriated aid for the Contras because they determined that the Contras' opposition to the present government in Nicaragua is important to our security interests. We have already held, in our earlier discussion of international law and *jus cogens*, that there is nothing constitutionally infirm in this foreign policy judgment. Appellants, however, would force the Congress to abandon its foreign policy objective; this fact bears decisively on their constitutional claim.

The reason is that the standard for determining whether government conduct violates due process varies with the context. As the Supreme Court has observed, " 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Ingraham v. Wright*, 430 U.S. 651, 675, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977) (citation omitted). "The requirements of due process are a function not only of the extent of the governmental restriction imposed but also of the extent of the necessity for the restriction." *Zemel v. Rusk*, 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965). "Actions permissible in controlling a riotous mob or in dealing with a life-threatening situation might weigh differently when taken against a peaceful pedestrian." *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981).

In *Davidson, Martinez,* and *Nishiyama*, there was no suggestion that government officials would have to renounce a legitimate policy objective in order to avoid the reckless conduct that would violate constitutional rights. Denying parole to a dangerous prisoner, tracking down a marauding convict, or isolating a belligerent inmate are not governmental actions that undermine a competing goal of public policy. The situation is very different when litigants seek to halt congressional funding of a foreign resistance movement. Congress and the President have determined that such funding is essential to this country's foreign policy interests. The risks to American citizens that attend such a policy do, therefore, "weigh differently" in the fifth amendment balance. *Shillingford*, 634 F.2d at 265.

Actions that Congress and the President take to protect national interests abroad sometimes require military force. Use of such force unavoidably entails tradeoffs between potential harm and benefit; it will often involve risks to Americans. Few military objectives can be pursued with the same restraint and care that we require of government when it acts at home. We note that other protective steps that Congress might consider in the present case—such as a ban on Americans' travel to Nicaragua—could independently implicate appellants' fifth amendment rights. *See Aptheker v. Secretary of State*, 378 U.S. 500, 505–09, 84 S.Ct. 1659, 1663–65, 12 L.Ed.2d 992 (1964); *cf. Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). In short, the political branches face difficult foreign policy choices, and when they make those choices—particularly, when both branches act together—they are entitled to great deference. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Congress and the President have not violated appellants' fifth amendment rights by failing to protect them from the Contras' military activities.

*Tortious Acts:* Appellants cite no case in which a reckless government act (as opposed to an omission to prevent injury) violated due process by facilitating a third party's infliction of harm. In considering whether such a constitutional tort is possible, we reiterate that reckless conduct is a necessary, though not sufficient, condition for deprivations of due process. A reckless tortfeasor must "know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500 (1965). It is difficult to envision what sorts of government acts could "recklessly" facilitate third parties' intentional torts. In order for such facilitation to be even negligent, the intentional misconduct by third parties must be highly foreseeable. *Id.* § 302 B comment d. Rarely, then, would the risk of such government-fostered harm be "substantially greater than that which is necessary to make this conduct negligent." *Id.* § 500.

At least one court has found that the government cannot commit a constitutional tort in such circumstances. In *Hirst v. Gertzen*, 676 F.2d 1252 (9th Cir.1982), county officials were sued under 42 U.S.C. § 1983 for "gross negligence" in hiring a

prison guard allegedly known for sadistic behavior toward inmates and who allegedly caused the death of plaintiffs' decedent. The trial court found "as a matter of law, that there is no such gross negligence as ... would constitute a violation of any of the [decedent's] civil rights." *Id.* at 1262 n. 27. The Second Circuit appeared to affirm this holding, though it remanded the case on the theory—now foreclosed by the Supreme Court's decision in *Davidson v. Cannon*—that mere negligence might support a constitutional claim. *Cf. Barbera v. Smith*, 836 F.2d 96 (2d Cir.1987) (assistant U.S. attorney may have recklessly facilitated the contract murder of government witness—and thus violated the witness' fifth amendment rights—by informing criminal defendant of witness' identity; constitutional claim was foreclosed, however, by attorney's qualified immunity).

If the *Hirst* court doubted that local prison officials can violate an inmate's constitutional rights by hiring a violent prison guard, it is all the more unlikely that the entire Congress could act with sufficient recklessness (in supporting a foreign resistance movement) to violate appellants' constitutional rights. We think this is particularly true inasmuch as whether government action poses "unreasonable" risks is largely determined by "the burden of taking precautions." W. Prosser & W. Keeton, *Prosser and Keeton on Torts* § 33, at 203 (5th ed. 1984) (footnote omitted). Here, the burden appellants would impose is large indeed; they seek to prevent Congress from pursuing its foreign policy objectives in Central America.

We need not follow the *Hirst* court, however, in finding "as a matter of law, that there is no such gross negligence" in Congress' pursuit of a foreign policy that could violate citizens' rights. We hold only that the degree of congressional recklessness that appellants must demonstrate to sustain their constitutional claim—both the risk that funding of the Contras would result in deliberate injury to appellants and Congress' awareness of that risk—would at the least have to be very high. Appellants fall far short of alleging the facts that would support such recklessness.

The insufficiency of the evidence is particularly clear in this case, since the record includes affidavits and other material that appellants filed in support of a summary judgment motion in the district court. These submissions reveal very weak factual predicates for Congress' allegedly unconstitutional "recklessness." On the one hand, a Contra spokesman is said to have stated to the media that the Contras consider "internationalists" in Nicaragua as "part of the enemy." On the other hand, it is asserted that two residents of Nicaragua who are known to be Americans have been repeatedly detained, that an American priest has had threatening "encounters" with the Contras, and that another American has been killed by the Contras. There must be a much stronger allegation of deliberate targeting of Americans by the Contras, and of congressional awareness of that targeting, before the possibility of due process violation would arise—even assuming that the fifth amendment encompasses a recklessness standard in these circumstances.

\* \* \* \* \* \*

Our discussion of whether government acts that facilitate (or fail to prevent) harm inflicted by third persons can violate due process may suggest that the standard of recklessness simply does not apply when Congress' pursuit of foreign policy is at issue. Perhaps, in such circumstances, intentional government misconduct must be shown before a claimant can demonstrate a deprivation of his constitutional rights. However, we need not sweep so broadly in our conclusion here. Instead, we take our cue from the Supreme Court's approach in *Martinez v. California.* Just as the *Martinez* Court declined to hold that parole board decisions could never give rise to constitutional violations, so we decline to hold that Congress' "reckless" support for a foreign organization that harms Americans could never deprive those Americans of their constitutional rights. But, before such support could threaten a constitutional violation, the foreign organization's deliberate infliction of harm upon Americans —as well as Congress' awareness of this

pattern of abuse—would have to be much clearer than appellants allege that it is in this case.

### III. CONCLUSION

There is no question that, in the second half of the twentieth century, the protections afforded individuals under international law have greatly expanded. At one time, international law concerned itself chiefly with relations among states, occasionally with relations between a state and citizens of other states, and almost never with a nation's treatment of its own citizens. *See, e.g.,* Sohn, *The New International Law: Protection of the Rights of Individuals Rather than States,* 32 Am.U. L.Rev. 1, 9 (1982). That has now changed, *id.* at 9–11, and government officials can be held responsible for certain egregious violations of their own citizens' rights. *See, e.g., Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980) (international law proscribes "official torture"). Notwithstanding these changes, however, the expanded law of nations does not encompass the principles that appellants advance in this lawsuit. No principle of *jus cogens* protects citizens from harm that may result from their own government's contravention of an ICJ decision. Nor has the expansion of international law altered the principle of domestic law that congressional enactments cannot violate but can only supersede prior inconsistent treaties or customary norms of international law. For these reasons, we dismiss so much of appellants' cause of action as is based on international law.

We also find that appellants' fifth amendment cause of action fails to state a claim on which relief can be granted, though for somewhat different reasons. We do not conclude that Congress' pursuit of a foreign policy could never give rise to a deprivation of rights cognizable in domestic courts. We say only that what constitutes a deprivation of our citizens' liberty and property "without due process of law" must be gauged by the circumstances—in this case, Congress' pursuit of foreign policy objectives. The risk to Americans that Congress accepted in deciding to fund the

Contras may or may not satisfy the standard for "reckless" conduct as a matter of domestic tort law. But appellants' factual averments concerning the Contras' injuries to Americans in Nicaragua cannot support a constitutional claim against the United States for its support of that foreign "resistance" movement. Accordingly, appellants' fifth amendment claims are also dismissed.

*It is so ordered.*