Vitor Manuel DeSena **GOUVEIA**, Plaintiff,

v.

Thomas R. **VOKES**, Defendant.

Civ. A. No. 92–3370.

United States District Court, E.D. Pennsylvania.

Aug. 18, 1992.

Lawrence J. Roberts, Nemeroff, Roberts & Saffren, P.C., Elkins Park, Pa., for plaintiff.

Kenneth I. Trujillo, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

DALZELL, District Judge.

Vitor Manuel DeSena Gouveia, a naturalized American citizen, has filed an application for a writ of habeas corpus to prevent his extradition to Portugal to serve a three year, nine month sentence that was imposed upon him *in absentia.* In his application for the writ, Mr. Gouveia has raised a serious constitutional question about a provision in the International Narcotics Control Act of 1990, now codified at 18 U.S.C. § 3196, that seeks specifically to amend the extradition treaty that has existed between the United States and Portugal since 1908. Assuming the terms of the 1908 Treaty may be held to apply to him, Mr. Gouveia also raises substantial questions about the propriety of applying the 1990 statute to 1985 conduct that was adjudged criminal in Portugal in 1987.

*Background*

The Government of Portugal on October 22, 1991, by a Note ultimately delivered to the United States Department of Justice on January 27, 1992, requested the extradition of Mr. Gouveia pursuant to an Extradition Treaty entered into by the United States and Portugal on May 7, 1908, and proclaimed by the President on December 14, 1908, 35 U.S.Stat. 2071. This Treaty will for convenience be referred to as the "1908 Treaty". The United States, acting as agent for the Government of Portugal, brought the matter before a United States Magistrate Judge pursuant to 18 U.S.C. § 3184, pertaining to the extradition of "fugitives from foreign country to United States."

This represents the second time Portugal has sought to extradite Mr. Gouveia. In August of 1990, at Magistrate No. 90–0658, Mr. Gouveia was arrested as a result of an earlier Portuguese extradition request. On September 20 of 1990, however, the complaint was dismissed without prejudice because the government learned that Mr. Gouveia was a naturalized U.S. citizen, and the government agrees that the 1908 Treaty does not permit the extradition of United States citizens. Specifically, Article VIII of the 1908 Treaty provides:

Under the stipulations of this Convention, neither of the Contracting Parties shall be bound to deliver up its own citizens or subjects.

*See also Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), which confirmed that this treaty language forbids the extradition of American citizens.

Two months after this dismissal, Congress adopted the International Narcotics

Control Act of 1990, P.L. 101–623, 104 Stat. 3350, approved November 21, 1990 (H.R. 5567), sometimes referred to herein as the "1990 Act." Section 11 of the International Narcotics Control Act of 1990 is now codified at 18 U.S.C. § 3196, which provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

Encouraged by this new law, Portugal has again sought Mr. Gouveia's extradition to serve the sentence that was imposed upon him *in absentia* on May 5, 1987. The Government of Portugal's October 22, 1991 Note was forwarded to this district on January 30, 1992, and a second complaint and warrant for Mr. Gouveia's arrest were issued. Mr. Gouveia was arrested on May 13, 1992 by the United States Marshal's Service, and on May 19 Judge Ludwig ordered that Mr. Gouveia be released on $150,000 bond secured by six properties.

Following a May 27, 1992 extradition hearing, United States Magistrate Judge Edwin Naythons found that Mr. Gouveia was subject to extradition by virtue of the new § 3196. *In the Matter of the Extradition of Vitor Manuel DeSena Gouveia,* Magistrate No. 92–0516–M (June 10, 1992). Thereupon, Mr. Gouveia filed the instant application for a writ of habeas corpus against Thomas R. Vokes, the United States Marshal. On June 11, 1992, we stayed Magistrate Judge Naythons' Extradition Order and continued the bail Judge Ludwig had set.[1] On June 15, 1992, we held an evidentiary hearing to resolve the question whether Mr. Gouveia was in fact in Portugal at the time of the conduct that

the Portuguese court found to have been criminal. The testimony and Mr. Gouveia's passport established that he was in Portugal from March 24 through May 2 in 1985, and the parties now stipulate to this fact.

Having ordered briefing on the issues discussed in this Memorandum, extensive oral argument was conducted on July 14, 1992. We received supplementary submissions on July 21. For the reasons stated below, we believe Mr. Gouveia is entitled to relief, and we will therefore grant the application for the writ and order Mr. Gouveia's immediate release from custody.

## Legal Analysis

Mr. Gouveia argues that he is entitled to remain in the United States for three reasons. First, he claims that his conduct is not covered by the terms of the 1908 Treaty. Among other things, he contends that the crime of "attempted counterfeiting" for which he was convicted *in absentia* in 1987 is not an enumerated offense under the terms of the 1908 Treaty. Second, assuming that his conduct *is* covered by the 1908 Treaty, Mr. Gouveia argues that § 11 of the International Narcotics Control Act of 1990 should not be applied retroactively to abrogate the protection he enjoys under Article VIII of the 1908 Treaty. Third, in the event that his first two arguments are rejected, Mr. Gouveia asserts that § 11 of the 1990 Act is unconstitutional because it on its face amends Article VIII of the 1908 Treaty in contravention of the treaty-making provisions of art. II, sec. 2 of the United States Constitution.

We will consider all three of these contentions.

### A. Scope of Review

■ Mr. Gouveia has filed his application for the writ because the Magistrate Judge's finding of extraditability is not

---

1. Pursuant to *In re Mitchell,* 171 F. 289, 290 (S.D.N.Y.1909) (Hand, J.), we found as the required "special circumstances" the substantiality of all three claims Mr. Gouveia raises as well as the absence of any risk of flight. The substantiality of the issues will become apparent later in this opinion. As to the risk of flight, at the bail hearing we found that Mr. Gouveia is married with two children, 11 and 7, owns his own home in Northeast Philadelphia, and maintains what appears to be a successful business renovating homes in the area. He has never been charged with any offenses in his adopted country—he became a citizen in 1985—and as far as we are aware the Portuguese proceeding is the only blemish on his record.

subject to direct appeal, *Collins v. Miller*, 252 U.S. 364, 369–70, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920), and thus collateral review is possible only through a habeas corpus proceeding. *Hooker v. Klein*, 573 F.2d 1360, 1364 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). The Supreme Court has held that the inquiry into extradition orders is, in this collateral proceeding, restricted:

> [H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925).

■ The Supreme Court has also held that the sufficiency of the evidence establishing the accused's criminality is not reviewable on habeas corpus. *Grin v. Shine*, 187 U.S. 181, 192, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902). As the Court stated in *Fernandez*, the writ "is not a means for rehearing what the magistrate already has decided." *Id.*

There is little question that the issues Mr. Gouveia raises are within the scope *Fernandez* permits us. If, as he argues, § 11 of the 1990 Act cannot apply to him, he could not be deemed within the Treaty's scope. Additionally, under a favorable ruling on any of these issues, the Magistrate Judge would have had no jurisdiction to do in 1992 what he was legally disabled from doing in 1990.

Because we believe we must consider all three of the issues Mr. Gouveia proffers, we find that we are on largely uncharted seas. No case has been brought to our attention that involved a statute whose express terms and purpose were to amend the language of extant bilateral treaties between the United States and foreign powers.[2] The United States has advised us that, in addition to the 1908 Treaty, § 11 of the 1990 Act would amend thirty-three others that contain the same language as Article VIII of the 1908 Treaty.[3] The government has also advised that there are forty-five other extradition treaties that "are silent as to the extradition of nationals." Government's Memorandum of Law at 21–22. By contrast, since 1936, extradition treaties, apparently without exception, provide that "Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so." Art. 9 of the May 4, 1978, extradition treaty between the United States and Mexico, cited and discussed in *United States v. Alvarez–Machain*, —— U.S. ——, ——, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992).

**B. *Have The Requirements of the 1908 Treaty Been Met Here?***

At the outset, our inquiry here is limited to whether the crimes charged are contemplated under the terms of the 1908 Treaty and whether Mr. Gouveia should be bound over and returned to Portugal in accordance with the Treaty. *See Bingham v.*

---

**2.** The issue thus differs from the much more amorphous question of whether statutes can contravene "international law" or resolutions or actions adopted under the United Nations Charter, to which courts have answered "yes." *See, e.g., Diggs v. Shultz,* 470 F.2d 461 (D.C.Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973) (Byrd Amendment, among whose purposes was to resume trade with Rhodesia, then the subject of a U.N. trade boycott); *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929 (D.C.Cir. 1988) (aid to contras after adverse decision in International Court of Justice). At bottom, such cases are based upon the political question doctrine, counselling judicial avoidance of foreign policy choices by the political branches.

**3.** United States treaties with Albania, Austria, Belgium, Bolivia, Bulgaria, Chile, Congo, Cuba, Czechoslovakia, Dominican Republic, Egypt, El Salvador, Estonia, Greece, Haiti, Honduras, Hungary, Iceland, Iraq, Latvia, Liberia, Lithuania, Luxembourg, Monaco, Panama, Peru, Poland, Portugal, Romania, San Marino, Suriname, Switzerland, Venezuela, Yugoslavia. List provided by the Office of International Affairs, U.S. Department of Justice, Criminal Division, Washington, D.C., June 2, 1992.

*Bradley,* 241 U.S. 511, 516–17, 36 S.Ct. 634, 636–37, 60 L.Ed. 1136 (1916); *McNamara v. Henkel,* 226 U.S. 520, 523, 33 S.Ct. 146, 146, 57 L.Ed. 330 (1913); *Ornelas v. Ruiz,* 161 U.S. 502, 508–09, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896).

█ Mr. Gouveia's first argument under the 1908 Treaty is "that there has not been sufficient proof that he committed the crime of which he was convicted while he was actually in Portugal", as required under Art. I of the 1908 Treaty. Memorandum of Law in Support of the Granting of the Writ of Habeas Corpus at 3 ("Gouveia's Memorandum of Law"). Article I provides, in relevant part, that the Contracting Parties

> ... shall, upon mutual requisition duly made as herein provided, deliver up to justice any person who may be charged with or may have been convicted of any of the crimes specified in Article II of this Convention committed within the jurisdiction of one of the Contracting Parties *while said person was actually within the jurisdiction when the crime was committed,* and who shall seek an asylum or shall be found within the territories of the other.... (emphasis added).

Acknowledging, as he must, that Mr. Gouveia "clearly was in Portugal during the time when some of the activity with regard to the crime were [*sic*] occurring," Gouveia's Memorandum of Law at 4, he nonetheless contends that our inquiry must establish that he in fact was in Portugal "when the crime was actually committed."

Mr. Gouveia claims that he was not physically in Portugal for the entire time that the Criminal Court of Lisbon, Third Criminal Chamber, found was the period of the alleged conspiracy with two Portuguese nationals. This Portuguese Court unquestionably did find that acts in furtherance of

the counterfeiting conspiracy took place between March 24 and May 2, when Mr. Gouveia *was* in Portugal.[4]

We conclude that, as to this point, Mr. Gouveia asks us to draw too fine a line. As noted earlier, the Supreme Court has held that "[t]he sufficiency of such evidence to establish the criminality of the accused for the purposes of extradition cannot be reviewed upon *habeas corpus.*" *Grin v. Shine, supra,* 187 U.S. at 192, 23 S.Ct. at 103. There clearly was, within the meaning of 18 U.S.C. § 3184, "the evidence of criminality" that is required for extradition. Given the modest requirements of § 3184, to say nothing of the limit the Supreme Court has placed upon us in *Grin v. Shine,* we *a fortiori* cannot question whether, in fact, the Portuguese Court was correct in finding Mr. Gouveia guilty. Having established that he "was actually within the jurisdiction" during most, if not all, of the period "when the crime was committed" in the view of the Third Criminal Chamber of Lisbon, our inquiry on this point is surely complete.[5]

Mr. Gouveia's more substantial argument under the 1908 Treaty is that he was not convicted of an extraditable crime. Mr. Gouveia points out that the Third Criminal Chamber in Lisbon found Mr. Gouveia guilty "concerning the crime of counterfeiting currency in the attempted form". *See* the official translation of the transcript of the proceedings of Accusation no. 1830/86, attached to the October 7, 1988 certificate of the United States Ambassador, at 25. Mr. Gouveia calls our attention to the offenses listed in Art. II of the 1908 Treaty, and makes the ingenious argument that by mentioning "attempt" only at § 2 when it included "attempt to commit murder", the Treaty excluded all other attempt crimes. Mr. Gouveia buttresses this argument by examining all of the Treaties negotiated

---

**4.** The parties ultimately stipulated that Mr. Gouveia was in Portugal between these dates in 1985. Transcript of July 14, 1992, Oral Argument at 3–4. This transcript is referred to herein as "Tr."

**5.** In fairness to Mr. Gouveia, he strenuously maintains his complete innocence of the crime

of which he was convicted *in absentia.* While we are not inclined to doubt his good faith, and while his defenses might well create "reasonable doubt" in the minds of an American jury, we simply cannot impugn the regularity of the 1987 proceedings in Lisbon, and we do not in any way in this Memorandum do so.

during the administration of Theodore Roosevelt, and finds that in six of them extradition was not permitted for any attempt except attempted murder, but that in four [6] there was a wholesale provision including attempts to commit any enumerated crime. For example, Article II, § 23 of the Treaty with Guatemala provides:

> Extradition shall also be granted for the attempt to commit any of the crimes and offenses above enumerated, when such attempt is punishable as a felony by the laws of both contracting parties.

██ Although the United States acknowledges that this is a weighty argument,[7] it replies by referencing us to the last phrases of Article I of the 1908 Treaty, which provide:

> ... that such surrender shall take place only upon such evidence of criminality as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension for trial if the crime or offense had been there committed.

The government correctly points out that the conduct the Third Criminal Chamber of Lisbon found criminal would also make all of the defendants guilty of counterfeiting under United States law, 18 U.S.C. § 474 ("Whoever prints ... any engraving, photograph, print, or impression in the likeness" of any United States currency "or any part thereof ... [s]hall be fined ... or imprisoned...."). The government also points out that even if Mr. Gouveia were not present for every act of the conspiracy, he would still run afoul of 18 U.S.C. § 2(a) ("Whoever ... aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal.").

The Supreme Court has instructed that "the law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability be coextensive". *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469,

470, 66 L.Ed. 956 (1922). This rule stems from the reality that penal codes vary widely in the descriptions they use for the same criminal conduct, and therefore the United States's obligations under its extradition treaties should not be hostage to the choice of language contracting countries have used in their criminal codes.

For example, in the recent case of *United States v. Sensi*, 879 F.2d 888 (D.C.Cir. 1989), the defendant was extradited from the United Kingdom to the United States where he was charged with mail fraud. Mail fraud is not an enumerated crime under the extradition treaty between the United States and Great Britain. The British Magistrate nevertheless extradited the defendant on the theory that mail fraud was analogous to theft, which *was* an enumerated crime under the Treaty. The defendant argued that under United States law mail fraud does not require theft as an element of the offense, and therefore mail fraud could not constitute an enumerated crime. The Court of Appeals for the District of Columbia Circuit rejected this argument and held:

> The fact that a hypothetical person could be convicted of mail fraud in the United States *absent a theft* is irrelevant to this case, in which the 'offense' was theft.... [I]n the present case, the question is whether Sensi's alleged acts would constitute a crime in the United Kingdom. The British magistrate found that his acts consisted of stealing money and that those acts would justify committal for trial under United Kingdom law had they been committed in the United Kingdom.

879 F.2d at 894 (emphasis in the original).

While Mr. Gouveia's argument from a comparison of the treaties made during the Theodore Roosevelt administration has much to commend it, we are persuaded that the more practical approach embodied in the District of Columbia Circuit's decision in *Sensi* represents the better view. For this reason, we decline Mr. Gouveia's invi-

---

**6.** *See* the Treaties with Guatemala, proclaimed July 17, 1904, with Haiti, proclaimed June 28, 1905, with Nicaragua, proclaimed June 15, 1907, and with France, proclaimed July 26, 1911.

**7.** Tr. at 54.

tation to hold that the 1908 Treaty does not, by its terms, apply to him.

## C. *Should § 11 of the 1990 Act Apply to Mr. Gouveia?*

Mr. Gouveia argues that "it is clear that the Government is seeking to retroactively apply § 3196 to Mr. Gouveia." Gouveia's Memorandum of Law at 13. He contends that because the International Narcotics Control Act was not effective until November 21, 1990, it cannot be applied "for events which occurred prior to 1987 and that eventually concluded in that year." *Id.* Mr. Gouveia buttresses this argument by pointing out that this is the second time that extradition proceedings have been commenced against him based upon the same events, and therefore the new law would have to be given retrospective application to affect his rights.

Again, this is a substantial claim, and one that has occasioned much contention between the parties.

Although the government seeks to minimize the significance of § 11 of the 1990 Act by saying that it is merely "curative or procedural", Government's Memorandum of Law at 18, this description would seem to be at most half correct. While it is certainly true that, regarding the 1908 Treaty as a contract between Portugal and the United States, the change of § 11 might be deemed "curative or procedural", it strains credulity to regard it that way from Mr. Gouveia's point of view. As he in fact dramatically benefitted in September of 1990 from the application of Article VIII of the 1908 Treaty in contrast to the extradition that § 3196 would allow, the change in law could hardly be more substantive to Mr. Gouveia.

The conundrum whether § 11 of the 1990 Act is "curative or procedural" or "substantive" stems from the nature of treaties themselves under our Constitution. As will be seen in the next section, the Framers themselves regarded treaties as *sui generis*, having some characteristics of both contracts between nations and ordinary laws.

Viewing § 11 of the 1990 Act as amending the 1908 "contract", we could well conclude that Portugal's extradition request here does not implicate problems of retroactivity at all. The Note from the Portuguese Government to the United States State Department was dated October 11, 1991, eleven months after the 1990 Act was adopted. From the point of view of the United States, this Note triggered an immediate obligation on the United States under the 1908 Treaty. The Note created a present duty under the Treaty on the United States to act as Portugal's agent in apprehending Mr. Gouveia and surrendering him to the Portuguese authorities. In this sense, there was nothing retrospective called for of the United States.

We would be fortified in such a view by the Supreme Court's recitation of the law of international extradition that allows a government to pursue extradition notwithstanding prior unsuccessful efforts. The government calls our attention to the Supreme Court's statement in *Collins v. Loisel*, 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923) ("*Loisel II*"), where the Court observed that "it has been consistently held under the treaties with Great Britain and other countries, that a fugitive from justice may be arrested in extradition proceedings a second time upon a new complaint charging the same crime, where he was discharged by the magistrate on the first complaint or the complaint was withdrawn." *Loisel II* at 429, 43 S.Ct. at 619 (footnote and citations omitted). While acknowledging the potential for "unjustifiable vexation and harassment incident to repeated arrests for the same alleged crime", the Court was willing to accept this harsh result because of its belief that "a high sense of responsibility on the part of the public officials" seeking extradition would prevent abuse. *Id.* at 429–30, 43 S.Ct. at 619.

In truth, *Loisel II* is considerably more equivocal than the government has depicted it. While containing the broad statement just quoted, Justice Brandeis framed it in his opinion for the Court with distinctions of particular relevance here. Against the view that double jeopardy is violated, Justice Brandeis noted that the case before

the Court only involved the earliest stage of a criminal proceeding, 262 U.S. at 429, 43 S.Ct. at 619 ("The preliminary examination of one arrested on suspicion of a crime is not a trial"), in contrast with Mr. Gouveia's case, where the Portuguese adjudication of criminality is final. On the next page of his opinion, Justice Brandeis suggested that "a judgment in *habeas corpus* proceedings discharging a prisoner held for preliminary examination may operate as *res judicata*", *id.* at 430, 43 S.Ct. at 619, and adds that "The discharge here in question did not go to the right to have Collins held for extradition."

Other dicta from the Supreme Court suggest doubt about the government's position here. In *The Chinese Exclusion Case*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), there are statements that would permit the inference that an American citizen who has benefitted from an extant treaty provision cannot be legislatively deprived of that benefit. Although it will be discussed at much greater length in the next section of this Memorandum, it will suffice here to note that the *Chinese Exclusion Case* involved a claim by a Chinese national, Chae Chan Ping, who was excluded from the United States on his return to San Francisco in 1888 notwithstanding his possession of a certificate entitling him to return under an earlier, but since repealed, statute. Although most of Justice Field's opinion for the Court dealt with legislative history and the political question doctrine in affirming the refusal of reentry to Mr. Ping, two points in Justice Field's opinion suggest that the result might be different here.

Against Mr. Ping's retroactivity arguments,[8] the Court first noted that:

Of course, whatever of a permanent character had been executed or vested under the treaties was not affected by it [the later statute]. In that respect the

abrogation of the obligations of a treaty operates, like the repeal of a law, only upon the future, leaving transactions executed under it to stand unaffected.

130 U.S. at 601–602, 9 S.Ct. at 628. Later, Justice Field cited the example of a real estate transaction "purchased or secured under a treaty" which could "not [be] affected by the termination or application of a treaty," and contrasted this with "expectations of benefits from the continuance of existing legislation" which could be. *Id.* at 610, 9 S.Ct. at 631.

One could legitimately conclude that the termination of the first extradition proceeding against Mr. Gouveia was demonstrable evidence of something "of a permanent character [which] had been executed or vested under the" 1908 Treaty, and therefore later Congressional action could not destroy this benefit, at least to an American citizen like Mr. Gouveia who enjoys all of the protections of the United States Constitution. This conclusion would be consistent with the dicta cited from *Loisel II* and with the general rule the Supreme Court summarized in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988):

Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. [citations omitted]

This rule surely should be given great weight here given the severe penal consequences application of the 1990 Act would have on Mr. Gouveia.[9]

Absent the concerns described in the next section, we would nevertheless be reluctant to create what seems to us to be a new right supported chiefly by the dicta of the *Chinese Exclusion Case* and *Loisel II*. As a general proposition, the Government

---

**8.** It is worth noting here that most of Mr. Ping's arguments to the Court dealt with what he claimed was the improper retroactive application of the 1888 law to him. *See* 130 U.S. at 585–589.

**9.** We recognize that *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) remains in "apparent tension" with *Bowen*, *see Kaiser Aluminum and Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990), but we do not read § 11 of the 1990 Act as evincing a clear Congressional expression of retroactivity, particularly in view of our later analysis in part D. below.

of Portugal had the right to make as many requests as it chose to extradite Mr. Gouveia, as a post-*Loisel II* court confirmed against claims of improper retrospective application. *United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955 (2d Cir.), cert. denied, 273 U.S. 769, 47 S.Ct. 572, 71 L.Ed. 883 (1927). Portugal can hardly be faulted for accepting the invitation Congress extended in § 11 of the 1990 Act. As noted, Portugal's acceptance of this Congressional offer created a present, and not retroactive, duty on the United States to respond.

If we were to hold that § 11 of the 1990 Act applies to Mr. Gouveia, we then would be required to determine the constitutional issue. Both Mr. Gouveia and the government press us to reach this gravest of issues. As will now be seen, consideration of the constitutional issue will greatly assist our resolution of the retroactivity question.

D. *Does § 11 of the 1990 Act Constitute an Unconstitutional Infringement of the President's Treaty–Making Power Under the Constitution?* [10]

In his third claim, Mr. Gouveia calls our attention to art. II, sec. 2 of the United States Constitution, which provides that the President

shall have the Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur. . . .

As Mr. Gouveia properly notes, the 1908 Treaty was made consistent with the treaty-making power of art. II of the Constitution. On the other hand, he argues that

"§ 3196 was a *Congressional* amendment which substantially amends the Extradition Treaty with Portugal, as well as many other extradition treaties, by allowing the extradition of United States citizens despite a provision to the contrary in those treaties". Gouveia's Memorandum of Law at 17 (emphasis in original). Because it is unarguable that the 1990 Act was not "made" by the President, and inasmuch as there is no evidence that two thirds of the Senators present adopted it, Mr. Gouveia argues that § 3196 cannot pass constitutional muster.[11]

The face of § 11 of the 1990 Act is entirely consistent with the purpose attributed to it when it was introduced. For example, in his introductory remarks to what was then called the National Drug Control Strategy Implementation Act of 1990, Senator Dole observed on May 18, 1990 that [12]

Under prevailing case law, the United States may extradite its nationals in the absence of any limiting language in a bilateral treaty. *Charlton v. Kelly*, 229 U.S. 447 [33 S.Ct. 945, 57 L.Ed. 1274] (1913). However, if an extradition treaty contains language which limits that authority, e.g., "neither party shall be bound to deliver up its own citizens", the Supreme Court has held that United States Nationals may not be extradited unless the treaty also contains a positive grant of authority to surrender United States citizens. *Valentine v. United States ex rel. Neidecker*, 229 [*sic*; should be 299] U.S. 5, 7–12 [57 S.Ct. 100, 101–104] (1936). Post-*Valentine* extradition treaties of the United States uni-

10. Because this issue involves a Presidential prerogative, we on July 14 invited counsel for the United States to inquire as to whether the President desired to have his interest separately represented. Tr. at 51–53. Although the government initially thought it unnecessary to answer this question in view of the absence of articulated concern on this point at the time President Bush signed H.R. 5567 into law, *see* 1990 *Weekly Compilation of Presidential Documents* 1897–1898, pursuant to our Order of July 21 we were advised on July 28 that the President, through the Deputy Director of the Office of International Affairs, Criminal Division, of the U.S. Department of Justice, declined our invitation.

11. The Senate version of H.R. 5567 was passed on October 26, 1990, by an unrecorded voice vote; hence there is no way of knowing whether there was informal compliance with the Constitution's requirement that two thirds of the Senators present concur. *See* Congressional Index 1989–1990, p. 35,107 (December 7, 1990).

12. The legislative history of the 1990 Act contains few explanatory texts. Senator Dole's formal introductory statement is by far the most comprehensive, and contains the only discussion we have found about what became § 11 of the 1990 Act.

formly contain language such as "[N]either of the contracting parties shall be bound to deliver up its own citizen under the stipulations of this convention, *but the executive authority of each shall have the power to deliver them up, if, in its discretion, it is deemed proper to do so."* (Emphasis added). Such a clause contains the necessary positive grant of authority to the Executive to extradite United States citizens.

However, the United States still has several pre-*Valentine* treaties in force that contain the limitation but lack a requisite grant of authority. In those instances, the United States must refuse to extradite based on the nationality of the offender.

\* \* \* \* \* \*

The proposed amendment would remedy the problem caused by some pre-*Valentine* treaties by expressly permitting the surrender of United States nationals notwithstanding the language of limitation in those treaties. This provision is consistent with the general policy of the United States favoring extradition of nationals to the country where the greatest harm has been suffered because of the commission of criminal acts, and against creating "universal" extraterritorial jurisdiction. It also recognizes the reality that it is not feasible to address this situation on a piecemeal basis by renegotiating all the pre-*Valentine* treaties that contain this flaw.

136 Cong.Rec. S 6598 (May 18, 1990).[13]

Thus, the explicit words and purpose of what became § 3196 was to amend, at a minimum, Article VIII of the 1908 Treaty and the similar language of the other thirty-three treaties like it. This is, as far as we are aware, an unprecedented Congressional action. Because we have found no dispositive judicial authority, the particular problems presented appear to be of first impression.

In order to analyze Mr. Gouveia's most serious challenge to this statute, we first look to the decisions of the Supreme Court[14] on analogous questions. As will be seen, it seems to us that no Supreme Court decision has construed the explicit Treaty rewritings that are present in the thirty-four treaties amended by § 11 of the 1990 Act. We therefore must turn to the record of the Framers to determine whether § 11 improperly upsets the allocation of treaty-making responsibility ordained in art. II sec. 2 of the Constitution.

1. Judicial views.

(a). The usual pattern.

Mr. Gouveia does not take issue with the line of Supreme Court cases, which the government cites, to the effect that Congress may modify or abrogate a treaty which has been previously entered into by the President. *See, e.g., Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951); *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); *Pigeon River Improv., Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 54 S.Ct. 361, 78 L.Ed. 695 (1934); *United States v. Payne,* 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924); *Head Money Cases,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). He points out, with much merit in our view, that "in none of the above-cited cases did Congress take it upon itself to actually amend the terms of a treaty." Gouveia's Memorandum of Law at 18. Rather, in most of these cases the conflict between the later law and the earlier treaty was incidental, and not advertent, and the Supreme Court merely affirmed the sensible rule of *lex posterior derogat priori,*

---

**13.** Senator Dole also explained the need for the amendment on the basis of international reciprocity: "If we continue to seek extradition of foreign drug lords for prosecution by United States Courts, we sh[o]uld be willing to assist other nations in similar efforts." 136 Cong.Rec. S 6586 (May 18, 1990).

**14.** No authority on these questions from our Court of Appeals has been brought to our attention. At oral argument on July 14, the government's attorney advised us that the government was not aware of any decisions from the Third Circuit on any of the issues presented in this case. Tr. at 36.

that as between an earlier and a later law, the later prevails.[15]

For example, the oldest case the government cites is *The Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 20 L.Ed. 227 (1871), where Congress, as part of a statute to raise revenue by taxing liquor and tobacco, provided that

> The internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars, shall be construed to extend to such articles produced anywhere within the exterior boundaries of the United States, whether the same shall be within a collection district or not.

The breadth of this statute was held by a majority of the Supreme Court to collide with a treaty between the United States and the Cherokee nation that provided, in relevant part,

> [E]very Cherokee Indian and freed person residing in the Cherokee nation shall have the right to sell any products of his farm ... or any merchandise or manufactured product ... without restraint, paying any taxes thereon which is now or may be levied by the United States in the quantity sold outside of the Indian territory.

Because the effect of the revenue law reached into "Indian territory," there was an incidental conflict which the Supreme Court subjected to the *lex posterior* rule.

To the same effect are the leading *Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), where Congress on August 3, 1882 adopted a head tax of "fifty cents for each and every passenger, not a citizen of the United States, who shall come by steam or sail vessel from a foreign port to any port within the United States...." Noting that the statute was enacted "to raise a fund for the sick, the poor, and the helpless immigrants," 112 U.S. at 589, 5

S.Ct. at 249, the Supreme Court rejected the contention that "it violated provisions contained in numerous treaties of our government with friendly nations." 112 U.S. at 597, 5 S.Ct. at 253. Although citing *The Cherokee Tobacco* and the *lex posterior* rule, the Court held it was "not satisfied that this act of Congress violates any of these treaties, or any just construction of them." *Id.* As noted, to the extent that any conflict did exist, the Court stated that the *lex posterior* rule would apply. Again, however, this was a case where if any conflict existed, it was incidental and not advertent.[16] Notably, no mention in the statute was made of any treaty, unlike Congress' action in § 11 of the 1990 Act.

The more recent decision of the Supreme Court in *Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), comes to the same conclusion as these earlier cases. In *Moser*, an 1850 treaty with Switzerland provided that "The citizens of one of the two countries, residing or established in the other, shall be free from personal military service...." Art. II of the Treaty of 1850, 11 Stat. 587, 589. The 1940 Selective Training and Service Act, 55 Stat. 845, stated in § 3(a) that neutral aliens who received immunity from military service "shall thereafter be debarred from" United States citizenship. Clearly, Congress in 1940 did not purport to address any term of the treaty adopted ninety years earlier, as the Court itself noted, 341 U.S. at 45, 71 S.Ct. at 555, but was rather adopting a comprehensive law on another subject that had an incidental effect on beneficiaries of the earlier treaty. Interestingly, the implementation of the 1940 statute was negotiated to Switzerland's satisfaction, *id.* at 44, 71 S.Ct. at 554, and the Court upheld the American citizenship that had been denied the Swiss-born non-combatant. *Id.* at 47, 71 S.Ct. at 556.

---

**15.** Thus, if a treaty is made after a statute and conflicts with the statute, the rule gives effect to the treaty as later in time. *See Cook v. United States*, 288 U.S. 102, 118–119, 53 S.Ct. 305, 311–12, 77 L.Ed. 641 (1933).

**16.** To the same effect was the Supreme Court's analysis four years later in *Whitney v. Robert-*

*son*, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888), where the Court again upheld a later statute "of general application", *id.* at 193, 8 S.Ct. at 458, against an earlier specific treaty with the Republic of San Domingo, to the extent that they conflicted.

The government puts much stress on one sentence in a concurrence of Justice Scalia in *United States v. Stuart*, 489 U.S. 353, 375, 109 S.Ct. 1183, 1196, 103 L.Ed.2d 388 (1989). Neither the Majority opinion nor Justice Scalia's concurrence negates our analysis. In *Stuart*, the issue was the interpretation the Internal Revenue Service had placed on a 1942 tax treaty with Canada, which was arguably affected by a 1982 statute dealing with IRS summonses after investigations have been referred to the U.S. Department of Justice. The Court found no conflict with the treaty, holding that the later statute was not intended "to apply to summonses issued pursuant to treaty requests." 489 U.S. at 365, 109 S.Ct. at 1190.

Justice Scalia in his concurrence agreed that the language of the 1942 treaty "is completely dispositive of respondent's claim under the agreement", 489 U.S. at 371, 109 S.Ct. at 1194, but would have held that there was no need to inquire about "the intent of the Treaty parties". *Id.* Justice Scalia took strong exception to "the nature of the extratextual materials to which the Court unnecessarily refers" in its interpretation of the 1942 treaty. 489 U.S. at 373, 109 S.Ct. at 1195. The gist of Justice Scalia's argument, while pertinent to the *sui generis* nature of treaties, hardly supports the government's position here:

> The question before us in a treaty case is what the two or more sovereigns agreed to, rather than what a single one of them, or the legislature of a single one of them, thought it agreed to. And to answer that question accurately, it can reasonably be said, whatever extra-textual materials are consulted must be materials that reflect the mutual agreement (for example, the negotiating history) rather than a unilateral understanding.

*Id.* at 374, 109 S.Ct. at 1195. Later, taking note of the Senate's power to attach reservations to treaties as a condition of ratification, which the President may either accept or reject, *id.* at 375, 109 S.Ct. at 1196, Justice Scalia also referred to the interpretation that either the executive or the courts have placed upon a treaty, which he stated Congress "may abrogate or amend ... as a matter of internal law" *id.*, citing the *Head Money Cases.* While this point would be apt for the forty-five treaties that are silent as to the extradition of citizens—both sides here agree that it is [17]—it is far from the problem presented here, which has nothing to do with any interpretation of the 1908 Treaty but rather involves the explicit, advertent amendment of it by a law and not by the President with the Senate's consent.

To summarize, what we have here called the "usual pattern" may thus be schematized as

—specific treaty → later general statute—

as to which the Supreme Court has uniformly applied the *lex posterior* rule.

### (b). The unusual pattern: *The Chinese Exclusion Case.*

While not cited in the government's original brief, many cases considering the usual pattern cite the *Chinese Exclusion Case* discussed in the previous section. We asked both parties at the July 14 argument to file supplemental briefs on *The Chinese Exclusion Case, Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (hereinafter, "*Chinese Exclusion Case*"), because of its possible relevance on the issue of retroactivity, noted earlier, but much more because of the expansive language of some of Mr. Justice Field's opinion for the Court at 599–600 of 130 U.S. that has been cited in these later decisions. The *Chinese Exclusion Case* requires careful analysis, including a precise review of the curious legislative and treaty history that so dramatically affected Mr. Ping when he was excluded from this country on his return to San Francisco in September of 1888.[18]

**17.** At the July 14 oral argument, Mr. Gouveia did not dispute the point that Congress may properly fill the vacuum created by the silence of these forty-five treaties on the issue of the United States' power to surrender its own citizens. Tr. at 14.

**18.** It risks understatement to note here that scholars have subjected the *Chinese Exclusion*

As noted in Justice Field's canvass of the pertinent legal history between the United States and the Empire of China, Congress, by Act of March 3, 1843, Chap. XC, placed $40,000 "at the disposal of the President of the United States, to enable him to establish the future commercial relations between the United States and the Chinese empire on terms of national equal reciprocity". 130 U.S. at 590, 9 S.Ct. at 624. Pursuant to this enterprise, the United States and the Empire of China concluded their first treaty on July 3, 1844, ratified in December of the following year at 8 Stat. 592. This treaty faithfully carried out the mandate of the 1843 statute, and established a " 'perfect, permanent and universal peace, and a sincere and cordial amity' ... between the two nations." *Id.*

Fourteen years later, in July of 1858, a new treaty was negotiated with the Chinese government, which the Senate ratified in August, 1859. 12 Stat. 1023. It "reiterated the pledges of peace and friendship between the two nations, renewed the promise of protection to all citizens of the United States in China peacefully attending to their affairs" but did not touch "upon the migration and emigration of the citizens and subjects of the two nations respectively from one country to the other." 130 U.S. at 592, 9 S.Ct. at 624.

The expansion of the relations that began in 1844 took a radical step forward with the conclusion of a third treaty, agreed to on July 28, 1868, and ratified in November of 1869. 16 Stat. 739. In Article V of this 1868 treaty, the two countries cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to the other for purposes of curiosity, of trade or as permanent residents.... They consequently agreed to pass laws [protecting citizens or subjects in their respective countries against apprehension].

130 U.S. at 592–593, 9 S.Ct. at 625.

The effect of this third treaty was soon felt in California "as the laborers came in crowds on each steamer that arrived from China, or Hong Kong, an adjacent English port." *Id.* at 594–595, 9 S.Ct. at 625–626. Justice Field conveyed the strong views of an 1878 convention held in California

setting forth, in substance, that the presence of Chinese laborers had a baneful effect upon the material interests of the State, and upon public morals; that their immigration was in numbers approaching the character of an Oriental invasion, and was a menace to our civilization; that the discontent from this cause was not confined to any political party, or to any class or nationality, but was well-nigh universal; that they retained the habits and customs of their own country, and in fact constituted a Chinese settlement within the State, without any interest in our country or its institutions; and praying Congress to take measures to prevent their further immigration. This memorial was presented to Congress in February, 1879.

*Id.* at 595–596, 9 S.Ct. at 626.[19]

Because "[m]any persons, however, both in and out of Congress, were of the opinion that so long as the treaty remained unmodified, legislation restricting immigration

---

*Case* to unrestrained criticism. *See, e.g.,* Henkin, "The Constitution and United States Sovereignty: A Century of *Chinese Exclusion* and its Progeny," 100 Harv.L.Rev. 853, 859 (1987) ("The *Chinese Exclusion* doctrine and its extensions have permitted, and perhaps encouraged, paranoia, xenophobia, and racism, particularly during periods of international tension."). As we mentioned to the parties on July 14, the members of the lower Article III judiciary are not at liberty to join this chorus. Tr. at 15–16, 30.

**19.** As a sympathetic biographer concluded, "Field was of course aware of what was going on" between his fellow Californians and the Chinese immigrants. Swisher, *Stephen J. Field* 210 (Brookings, 1930). Indeed, Justice Field's intimacy with the subject apparently qualified him, while still a Justice of the Supreme Court, in 1880 "to have written the plank adopted by the Democratic National Convention urging upon Congress the suppression of coolie immigration," *id.* at 222. Ironically, his Presidential aspirations that year were reportedly not shared by his fellow Californians who regarded his perceived judicial liberality toward the Chinese as politically disabling. *Id.*

would be a breach of faith with China", *id.* at 596, 9 S.Ct. at 626, Congress adopted another statute, 21 Stat. 133, c. 88, "appropriating money to send commissioners to China to act with our minister there in negotiating and concluding by treaty a settlement" of the perceived problem by the two governments. *Id.*

These negotiations bore fruit in a supplemental treaty of November 17, 1880, ratified in May of 1881. 22 Stat. 826. The first article of the 1880 treaty provided that

the Government of China agrees that the Government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable ...

130 U.S. at 596, 9 S.Ct. at 626. The treaty then described in general terms the legislation authorized. Pursuant to the contemplation of the new treaty, Congress on May 6, 1882 adopted a statute which, in its fourth section, required Chinese laborers to furnish "the proper evidence" of their right to travel between the United States and China. *Id.* at 597–598, 9 S.Ct. at 626–627. This 1882 law "was attended with great embarrassment from the suspicious nature, in many instances" of the "evidence" necessary to obtain the requisite certificate. *Id.* at 598, 9 S.Ct. at 627.

Congress therefore on July 5, 1884 passed further legislation to address "such manifold evasions" and prescribed a new certificate which "shall be the only evidence permissible [for a Chinese] to establish his right of entry" into the United States. *Id.* Because "[t]he same difficulties and embarrassments continued with respect to the proof of their former residence", *id.* at 599, 9 S.Ct. at 627, Congress passed yet another statute on October 1, 1888 entitled "An Act a supplement to an act entitled 'An act to execute certain treaty stipulations relating to Chinese'" *Id.* 25 Stat. 504, c. 1064. This last law voided the certificate issued under earlier laws to

"any Chinese laborer ... who shall have departed ... and shall not have returned before the passage of this act". It was pursuant to this last statute that Mr. Ping was rudely surprised on September 7, 1888 when the Collector of Customs of the Port of San Francisco told him that his certificate had been annulled and he therefore could not alight the steamship *Belgic.*

It will be noted that Congressional action both initiated and concluded the Sino–American drama that led to Mr. Ping's exclusion. The statutes of 1882, 1884, and 1888 were, by their terms, enacted within the explicit contemplation of the 1880 Treaty between the United States and the Empire of China.[20] Thus, however faithful one may regard the 1888 Act to the reasonableness contemplated in the last treaty between the two countries, it did not, by its terms, negate the treaty, as the Court itself recognized:

There being nothing in the treaties between China and the United States to impair the validity of the Act of Congress of October 1, 1888....

130 U.S. at 603, 9 S.Ct. at 629.

Thus, the Supreme Court was not faced with the problem presented to us here.

For this same reason, Justice Field's remarks about the power of Congress to modify or abrogate treaties are, in every sense, dicta. *See* 130 U.S. at 599–600, 9 S.Ct. at 627–628. Further, the most weighty considerations Justice Field gave in support of the 1888 statute was his belief in Congress' power in general to exclude "strangers" and, in the last analysis, because he believed the political question doctrine forbad judicial interference with the foreign policy decisions of the political branches:

The question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts.

**20.** The 1880 Treaty was thus of the "non-self-executing" variety Professor Henkin describes as "requiring an act of Congress to carry out the international obligation," in contrast with "self-executing treaties" such as the 1908 Treaty

which "without any legislative intervention the Executive and the courts will accord to claimants the benefits promised by the United States." Henkin, *Foreign Affairs and the Constitution* 157–158 (1972).

*Id.* at 602, 9 S.Ct. at 628. Justice Field went on to say in the same paragraph:

... whether a treaty with a foreign sovereign had been violated by him, whether the consideration of a particular stipulation of a treaty had been voluntarily withdrawn by one party so as to no longer be obligatory upon the other, and whether the views and acts of a foreign sovereign, manifested through his representative, had given just occasion to the political departments of our government to withhold the execution of a promise contained in a treaty or to act in direct contravention of such promise, were not judicial questions; that the power to determine them has not been confided to the judiciary, which has no suitable means to execute it, but to the executive and legislative departments of the government; and that it belongs to diplomacy and legislation, and not to the administration of existing laws.

*Id.* (citation omitted).[21]

The unusual pattern of the *Chinese Exclusion Case* thus may be schematized as:

—enabling statute → treaty → treaty → treaty → new enabling statute → treaty → treaty-enabled statute A → amendatory statute B → amendatory statute C—

and so the dicta surrounding this pattern cannot edify us in our present task.

Thus, upon careful analysis, the *Chinese Exclusion Case* does not resolve our present inquiry. Indeed, no *holding* of any Supreme Court case has been brought to our attention that may fairly be regarded to govern this case.

### (c). The unique pattern.

Contrasted against the usual pattern cases or the unusual pattern in the *Chinese Exclusion Case*, the pattern of the present case is unique:

—specific treaty → specific amendatory statute—.

At oral argument on July 14, the government conceded that the situation presented here is indeed unique, and thus this case is one of first impression. The government also agreed with us that the language in all of the preceding cases constitute, at most, dicta, but properly noted that "dicta" is not "a dirty word." Tr. at 46. Given the absence of a controlling holding, we must turn to the views of the Framers on the point of interest here.

### 2. The Framers' views.

Treaties existed from the earliest days of the colonies, and extradition was a subject covered in them. For example, just over four months after their arrival on the *Mayflower,* the Plymouth Plantationers on March 20 or 21, 1621, entered into a treaty with the Wampanoag that provided, at ¶ 2, "That if any of his [*i.e.,* Massasoit's people or Carver's] did hurt to any of theirs, he should send the offender, that they might punish him." Bradford, *Of Plymouth Plantation* 80 (Samuel Eliot Morison ed., 1952).

By the time of the Confederation, the new country decided to entrust the treaty-making power not to the executive, but to the Congress that was created under the Articles. Article IX of the Articles of Confederation gave "congress assembled ... the sole and exclusive right of ... entering into treaties and alliances...."[22] Given this grant of authority under the Articles, it is perhaps not surprising that the members of the 1787 Federal Convention assumed for most of their proceedings that the treaty-making power should be entrust-

---

**21.** Justice Field's fastidiousness about the separation of powers did not prevent his energetic lobbying for the ratification of the 1880 treaty. According to John F. Swift, one of the commissioners who helped draft the 1880 treaty (and later U.S. Senator from California), Justice Field, after informally opining that the treaty did not confer naturalization rights on the Chinese, agreed to

"do my best, Mr. Swift, to put this matter in the proper light with the senators from the

Pacific Coast, and all whom I can see and talk with. The treaty must not be lost." In a few minutes he was driving at full speed through the streets of Washington looking up senators, and for days he made it a point to be always on hand to explain away doubts and settle questions of international law.

Reported in Swisher, *supra* note 19, at 224.

**22.** Reproduced in 1 *The Complete Anti–Federalist* 104 (Storing ed., 1981).

ed to the Legislature and not to the Executive. Over thirty years after the Convention, Charles Pinckney reminded John Quincy Adams that Pinckney's Plan—which gave the treaty-making power exclusively to the Senate—apparently seemed natural enough that it was, as Pinckney noted, accepted "for more than Four months & a half of Five of the Federal Convention". 3 Farrand *The Records of the Federal Convention of 1787* 427 (1911) (letter of December 30, 1818).

Although Pinckney's Plan on this point held sway for most of the deliberations, as the summer wore on other options were considered. One was that "no Treaty shall be binding on the United States which is not ratified by a Law." 2 Farrand 383 (August 23 Journal). The reference to a "Law" would, naturally, mean that the House as well as the Senate would have to approve the treaty, thereby making it indistinguishable from any other statute.

According to Madison's account of his own thoughts, "Mr. Madison hinted for consideration, whether a distinction might not be made between different sorts of Treaties—allowing the President & Senate to make Treaties eventual and of Alliance for limited terms—and requiring the concurrence of the whole Legislature in other Treaties." 2 Farrand 394 (Madison, August 23).

When the Committee of Style reported on its draft on September 10, it provided, at Art. IV, § 4, that "The President by and with the advice and consent of the Senate, shall have the power to make treaties". 2 Farrand 574. The final draft of the Constitution provided:

He [the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur. . . .

*See* 2 Farrand 659.

Thus, the members of the 1787 Federal Convention considered several options before they adopted the allocation of responsibility that has been in effect since the ratification of the Constitution. The record from the 1787 Convention is unambiguous.

The President shall "make Treaties", and treaties are not "made" in the same way that "Laws" are made.

This issue of who makes treaties was not put to rest when the members adjourned the Federal Convention. Indeed, the matter was sufficiently controversial that two issues of *The Federalist* were devoted to it. These essays, No. 64 (Jay) and No. 75 (Hamilton), address all the issues that the members of the Federal Convention considered during the summer of 1787. These two tracts also remove any doubt that (a) the Constitution regards Treaties as *sui generis*, to be distinguished from the "Laws", and (b) the amendment—or, as Jay put it in No. 64, the "alteration" of Treaties—was to be accomplished precisely like the "making" of them. Because these two numbers of *The Federalist* are of such pertinence to the issue before us, they will be considered at length.

In No. 64, Jay squarely addressed the objection that too much was entrusted to the President at the expense of the Legislature:

Some are displeased with it [*i.e.*, the proposed Constitution], not on account of any errors or defects in it, but because, as the treaties, when made, are to have the force of laws, they should be made only by men invested with legislative authority.

*The Federalist* 487 (John C. Hamilton Ed., 1864).

Jay first noted that acts that "have the force of laws" are often not made by legislatures:

These gentlemen seem not to consider that the judgments of our courts, and the commissions constitutionally given by our governor, are as valid and as binding on all persons whom they concern, as the laws passed by our legislature. All constitutional acts of power, whether in the executive or in the judicial department, have as much legal validity and obligation as if they proceeded from the legislature, and therefore, whatever name be given to the power of making treaties, or however obligatory they may be when made, certain it is, that the

people may, with much propriety, commit the power to a distinct body from the legislature, the executive, or the judicial. It surely does not follow, that because they have given the power of making laws to the legislature, that therefore they should likewise give them power to do every other act of sovereignty, by which the citizens are to be bound and affected.

*Id.*

Especially pertinent to our present analysis, Jay then noted that the detractors "insist, and profess to believe, that treaties, like acts of assembly, should be repealable at pleasure." *Id.* In answer to this, Jay wrote:

These gentlemen would do well to reflect, that a treaty is only another name for a bargain; and that it would be impossible to find a nation who would make any bargain with us, which should be binding on them *absolutely*, but on us only so long and so far as we may think proper to be bound by it. They who make laws, may without doubt, amend or repeal them, and it will not be disputed that they who make treaties, may alter or cancel them; but *still* let us not forget, that treaties are made not by one only of the contracting parties, but by both; and consequently, that as the consent of both was essential to their formation at first, so must it ever afterwards be to alter or cancel them.

*Id.* at 487–488 (emphasis in original).

It is worth pausing for a moment to observe that Jay's authority on the points covered in No. 64 exceeds that rooted in his service as co-author of *The Federalist* and as the first Chief Justice of the Supreme Court. During the Confederation, Jay served as Secretary of Foreign Affairs from the inception of that office in 1784 until commencement of his duties as Chief Justice. He was, therefore, uniquely in a position to know with intimacy the problems with entrusting treaty-making to a

legislative body.[23] The voice of No. 64 is, therefore, to paraphrase Holmes, that of both logic *and* experience.

Hamilton, writing three weeks later in No. 75, continued Jay's line of argument that treaty-making is *sui generis:* "The power of making treaties is, plainly neither the one [legislative] nor the other [executive]." *Id.* at 557. Hamilton went on to explain that this power "relates neither to the execution of the subsisting laws nor of the enaction of new ones":

Its objects are, CONTRACTS with foreign nations, which have the force of law, but derive it from the obligations of good faith. They are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign. The power in question seems, therefore, to form a distinct department, and to belong, properly, neither to the legislative nor to the executive.

*Id.* (capitalization in original).

Thus, having considered many options, and after the robust ratification debate of which *The Federalist* tracts are the most eloquent and illuminating part, the uniqueness of the treaty-making power under the Constitution cannot be gainsaid. This unambiguous history did not prevent controversy from continuing. Indeed, in the celebrated contentions associated with John Jay's Treaty, President Washington, with evident exasperation, sent a message to the House of Representatives on the subject of that treaty on March 30, 1796, which began:

Having been a member of the General Convention,[24] and knowing the principles on which the Constitution was formed, I have ever entertained but one opinion on this subject, and from the first establishment of the Government to this moment, my conduct has exemplified that opinion, that the power of making Treaties is *exclusively* vested in the President, by and with the advice and consent of the Senate, provided two-thirds of the Sena-

---

**23.** The frustration Jay suffered under the scheme for treaty-making and foreign affairs under the Articles of Confederation is detailed in Monaghan, *John Jay* 244–277 (1935).

**24.** Washington was of course also its President.

tors present concur; and that every Treaty so made, and promulgated, thenceforward becomes the law of the land....

3 Farrand 371 (emphasis added).

President Washington continued his appeal to the deliberations and actions of his colleagues in 1787 when he said in the same message:

> If other proofs than these, and the plain letter of the Constitution itself, be necessary to ascertain the point under consideration, they may be found in the Journals of the General Convention, which I have deposited in the office of the Department of State. In those Journals it will appear, that a proposition was made, 'that no Treaty should be binding on the United States which was not ratified by a law,' and that the proposition was explicitly rejected.[25]

*Id.* (emphasis added).

Washington's struggle with Jay's Treaty seemed to have resolved the question of the allocation of power, at least until the 1990 International Narcotics Control Act. As previously noted, the sole reason given for not amending the thirty-four early extradition treaties was because it was "not feasible". While we are unaware of any constitutional doctrine that measures the allocation of constitutional power by feasibility, and with all deference, Senator Dole could not have meant what he said. "Feasibility" is defined as "capable of being done, accomplished or carried out; possible, practicable." V *Oxford English Dictionary* 783 (2nd ed., 1989). Plainly, while it may be difficult, it is "capable of being done" to amend this country's early extradition treaties.

The difficulty of this enterprise would certainly not have disturbed the members of the 1787 Convention, many of whom *wanted* treaties to be as difficult to make as possible. For example, Madison paraphrases Gouverneur Morris as saying:

> In general he was not solicitous to multiply & validate Treaties. He wished none to be made with G. Britain till she should be at war. Then a good bargain might be made with her. So with other foreign powers. The more difficulty in making treaties, the more value will be set on them.

2 Farrand 393 (Madison, August 23)

Jefferson was even more hostile: "On the subject of treaties, our system is to have none with any nation, as far as can be avoided." 11 T. Jefferson, *Writings* 38–39 (Bergh Ed.1907). Washington, too, counselled great restraint in making foreign "engagements"; as he put it in his Farewell Address, "The great rule of conduct for us in regard to foreign nations is ... to have with them as little *political* connection as possible." "It is our true policy to steer clear of permanent alliances with any portion of the foreign world...." 1 Richardson, *A Compilation of the Messages and Papers of the Presidents* 222, 223 (1897). It therefore should not be surprising that no treaties were made during the early years under the new Constitution and, indeed, only six were concluded under the Articles of Confederation. Henkin, *Foreign Affairs and the Constitution* 372, n. 2 (1972).

We therefore find no ambiguity in the record of the Framers in drafting, ratifying and implementing the 1787 Constitution. Most pertinent to the present problem, they chose to exclude the House of Representatives and gave a limited role to the Senate in the ratification of treaties, the making of which they entrusted to the President.

While the 1787 Constitution unquestionably equates ratified Treaties with Congressionally-adopted statutes as "the supreme Law of the Land," U.S. Const. art. VI, the "alteration" of bilateral treaties was, as confirmed by Jay in *Federalist* No. 64, to be treated exactly like the making of

---

**25.** The 1787 Convention entrusted its Journals "in the custody of the President [*i.e.*, Washington] ... subject to the order of Congress, if ever formed under the Constitution." 2 Farrand 648 (Madison, September 17). President Washington's appeal to the drafting history of the Constitution prompted a cry of "foul" from Madison who, in an April 4, 1796 letter to Thomas Jefferson, decried Washington's violation of the agreement that the deliberations "were to be kept sacred until called for by some competent authority." 3 Farrand 372.

them. It would seem clear that the reason art. VI of the Constitution states that

all treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land

is to assure that both states and courts will enforce them, contrary to the experience under the Articles of Confederation. As Story noted,

If they are supreme laws, courts of justice will enforce them directly in all cases, to which they can be judicially applied, in opposition to all state laws, as we all know was done in the case of the British debts secured by the treaty of 1783, after the constitution was adopted. If they are deemed but solemn compacts, promissory in their nature and obligations, courts of justice may be embarrassed in enforcing them, and may be compelled to leave the redress to be administered through other departments of the government. It is notorious, that treaty stipulations (especially those of the treaty of peace of 1783) were grossly disregarded by the states under the confederation. They were deemed by the states, not as laws, but like requisitions, of mere moral obligation, and dependent upon the good will of the states for their execution. Congress, indeed, remonstrated against this construction, as unfounded in principle and justice. But their voice was not heard.

Joseph Story, *Commentaries on the Constitution of the United States*, § 966, p. 686 (Rotunda and Nowak ed., 1987).[26] The purpose of stating that treaties would be "the supreme Law of the Land" was thus not to make them indistinguishable from the "Laws" in their creation and amendment, but to assure that the states and all courts would enforce them. *See also*, U.S.

Const. art. I, sec. 10, cl. 1: "No state shall enter into any Treaty, Alliance, or Confederation".

Section 11 of the 1990 Act presents us with a statute that on its face and as its explicit purpose amends the language of articles of thirty-four extradition treaties. Were we to countenance such overt, explicit Congressional amendment here, we would restore precisely the allocation of responsibility the Framers rejected in 1787. This harsh conclusion is thrown into relief when it is recalled that "Laws" can be made without *any* Presidential concurrence if two-thirds of the House and Senate agree. In such instances, Congress would by any fair meaning "make" new treaties by negating old ones and the President would have nothing to do with the international product created—indeed, he would by hypothesis totally oppose the action. This was the exact result the Framers thought they excluded when they wrote art. II sec. 2.

 Thus, given what seems to be the absence of controlling Supreme Court precedent on explicit Congressional amendment of the language of bilateral treaties, if the issue must be decided the voices of Jay, Hamilton, Washington and the other Framers speak in unison to one result. But when faced with two possible constructions of a statute, one implicating grave constitutional doubts and the other avoiding them altogether, our jurisprudence[27] and proper judicial restraint counsel the adoption of constructions that avoid such problems. This canon is surely at its most compelling when its application avoids a collision of the branches of our national government.

 We therefore hold pursuant to this canon that the 1990 Act cannot be con-

**26.** The absence of national authority in foreign affairs under the Articles of Confederation had reached such a low estate that Jay, as Secretary for Foreign Affairs, once became aware of the following extraordinary request from the British Foreign Secretary:

Strangled by the Articles of Confederation and nearly throttled by the states, Congress was dying on its feet. It became a kind of assembly of diplomats from the thirteen states, so that the British Foreign Secretary had some justification in demanding from

John Adams the presence of thirteen ambassadors to negotiate a commercial treaty with America.
*John Jay, supra* note 23, at 248.

**27.** *See, e.g., New York v. United States,* ⸺ U.S. ⸺, ⸺, 112 S.Ct. 2408, 2425, 120 L.Ed.2d 120 (1992); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988).

strued to apply to an American citizen like Mr. Gouveia whose conduct and prior adjudications antedate the new enactment.

This construction has the additional advantage of being consistent with the *lex posterior* rule enunciated in the usual pattern cases described above. For if law is respected only because it is later in time, it would be anomalous to apply it to acts and proceedings earlier in time.

*Conclusion*

All acts of Congress deserve the greatest deference from the judiciary, and this is no less the case with a statute like the 1990 Act, which has, as its overriding purpose, adding further weapons to fight the international war on drug trafficking. Section 11 of the 1990 Act was, as earlier noted, offered as a *quid pro quo;* in the words of Senator Dole in his introductory statement, "If we continue to seek extradition of foreign drug lords for prosecution by United States Courts, we sh[o]uld be willing to assist other nations in similar efforts." 136 Cong.Rec. S 6586 (May 18, 1990). While inevitably and regrettably there will be innocent victims in this international drug war, our holding today prevents Mr. Gouveia from being one of them. He remains entitled to the protection afforded him under Art. VIII of the 1908 Treaty.

The writ will therefore issue, and Thomas R. Vokes shall immediately release Mr. Gouveia from custody.